THE STATE OF OHIO, APPELLEE, *v.* STOJETZ, APPELLANT.

[Cite as *State v. Stojetz* (1999), 84 Ohio St.3d 452.]

(No. 97–1111—Submitted November 10, 1998—Decided February 17, 1999.)

454

*Stephen J. Pronai,* Madison County Prosecuting Attorney, and *Daniel H. Huston,* Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker,* Ohio Public Defender, *Joseph E. Wilhelm* and *Kelly Culshaw,* Assistant Public Defenders, for appellant.

DOUGLAS, J. Appellant presents nineteen propositions of law for our consideration. (See Appendix, *infra.*) We have considered each of appellant's propositions of law and have reviewed the death penalty for appropriateness and proportionality. Upon review, and for the reasons that follow, we affirm appellant's conviction and the sentence of death.

## I

We have held on a number of prior occasions that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal. We adhere to that position today as our judgment on that issue has not changed. We have, however, in this case, as in all other death penalty cases, carefully considered all of appellant's propositions of law and allegations of error and have, in its entirety, thoroughly reviewed the record. Many of the issues raised by appellant have been addressed and rejected by this court under analogous circumstances in a number of our prior cases. Therefore, these issues require little, if any, discussion. Moreover, a number of appellant's arguments have been waived. Upon a careful review of the record and the governing law, we fail to detect any errors requiring reversal of appellant's conviction and sentence. We have found nothing in the record or in the arguments advanced by appellant that would, in any manner, undermine our confidence in the integrity and reliability of the trial court's decision. Accordingly, we see no reason to deviate from our prior procedures in death penalty appeals. We address and discuss, in detail, only those issues that merit analysis.

## II

### Proposition of Law No. 1

Appellant contends that the trial court erred in failing to "life qualify" prospective jurors after they had been death qualified in accordance with *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph two of the syllabus. Appellant argues that, during voir dire, prospective jurors must be questioned *by the trial court* concerning any views on capital punishment that would prevent or substantially impair their ability to consider a life sentence, as opposed to the death penalty, should the case go to the penalty phase. Thus, appellant proposes that, in order to ensure basic fairness to both parties, the trial court must, *sua sponte*, life-qualify prospective jurors. For the following reasons we disagree.

Initially we note that appellant's trial counsel never objected to the jury selection process, nor did defense counsel object to the trial court's lack of "life qualification" questions. Thus, appellant has waived all but plain error. See Crim.R. 52(B). An alleged error "does not constitute a plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

R.C. 2945.27 provides that "[t]he judge of the trial court shall examine the prospective jurors under oath or upon affirmation as to their qualifications to

serve as fair and impartial jurors, but he shall permit reasonable examination of such jurors by the prosecuting attorney and by the defendant or his counsel." In *State v. Bedford* (1988), 39 Ohio St.3d 122, 129, 529 N.E.2d 913, 920, we stated that the scope of voir dire is within the discretion of the trial court and it varies depending on the circumstances of each case.

Appellant's first proposition of law is based substantially on *Morgan v. Illinois* (1992), 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492, wherein the United States Supreme Court held that, on voir dire, upon defendant's request, the trial court must inquire into the prospective juror's views on capital punishment. *Id.* at 729–734, 112 S.Ct. at 2230–2233, 119 L.Ed.2d at 503–506. The *Morgan* court, in so holding, reiterated its views, as set forth in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, *Adams v. Texas* (1980), 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581, *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841, and *Ross v. Oklahoma* (1988), 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80, that a capital defendant may challenge for cause any prospective juror who, regardless of evidence of aggravating and mitigating circumstances and in disregard to jury instructions, will automatically vote for the death penalty in every case. *Morgan v. Illinois,* 504 U.S. at 729, 112 S.Ct. at 2229, 119 L.Ed.2d at 502–503.

Appellant concedes that *Morgan* requires only life qualification by the trial court upon the defendant's request. Appellant would like, however, this court to go a step further in cases involving capital offenses and mandate an additional requirement on the trial court of life qualifying prospective jurors. This we decline to do.

In *State v. Allard* (1996), 75 Ohio St.3d 482, 493, 663 N.E.2d 1277, 1288, we followed the proposition set forth in *Morgan.* Thus, in *Allard,* we expressed our view that when the trial court permits defense counsel wide latitude to inquire into each prospective juror's beliefs and opinions concerning the death penalty, and defense counsel exercises that right, there is no reversible error in the death qualification process used in jury selection. *Id.*

Appellant does not contend that the trial court rejected defense counsel requests to question prospective jurors regarding their views on capital punishment. In fact, defense counsel was given ample opportunity by the trial judge to do so. A review of the voir-dire examination in this case undermines appellant's contentions that the trial court's failure to life qualify prospective jurors is somehow an uneven or unfair use of the voir-dire process. Of the jurors selected, appellant submits that two were not "life-qualified" by either the trial court or defense counsel. After review of their voir dire, we find that neither juror fits within the category of the "automatic death penalty juror" condemned in *Morgan.* In fact, both juror Suzanne Coffin and juror Richard Hirst expressed reserva-

tions about imposing the death penalty as a sentencing option. For instance, Coffin stated that voting for the death penalty "would never be an easy thing to arrive at and I would hope I would never have to make that judgement." Hirst stated that, because of his religion, he could not condone the death penalty. Hirst also indicated his belief that there should be just punishment for every crime but that he was not sure where he would stand on the imposition of capital punishment. Given these expressed misgivings and uncertainty over their ability to impose a death sentence, it would appear logical to assume that jurors Coffin and Hirst would not be opposed to imposing a life sentence.

Further, the United States Supreme Court in *Morgan* reiterated what the court had long recognized that " '[a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, then, *it is the adversary seeking exclusion who must demonstrate,* through questioning, that the potential juror lacks impartiality. It is then the trial judge's duty to determine whether the challenge is proper.' " (Emphasis added.) *Morgan v. Illinois*, 504 U.S. at 733, 112 S.Ct. at 2232, 119 L.Ed.2d at 505, citing *Wainwright v. Witt*, 469 U.S. at 423, 105 S.Ct. at 852, 83 L.Ed.2d at 851.

Accordingly, we decline to impose any new requirements on trial courts during the jury selection process in capital cases, and, specifically, we hold that there is no requirement for a trial court to "life qualify" any prospective juror, absent a request by defense counsel, in a capital murder case. As appellant has failed to meet his burden under the plain error standard, we reject appellant's first proposition of law.

### III

### Proposition of Law No. 2

Appellant's arguments concerning the appropriateness of his death sentence are addressed in our discussion in Part XXI, *infra.*

### IV

### Proposition of Law No. 3

Appellant, in his third proposition of law, argues that he was deprived of the effective assistance of trial counsel. Many of the claimed errors raised by appellant have been or will be addressed in our discussions of other propositions of law. See, Part II, *supra,* Parts VII, VIII, IX, X, XVI, XXI, *infra.* Assuming *arguendo* that defense counsel was ineffective, this alone would not warrant reversal. To warrant reversal, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington* (1984), 466

U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698. After reviewing the record in its entirety and considering all claims of alleged ineffectiveness, we find that appellant has failed to establish ineffective assistance of counsel under the standards spelled out in *Strickland.*

V

### Proposition of Law No. 4

In proposition of law four, appellant claims that the trial court erred in failing to specifically instruct the jury that it must find by unanimous verdict that appellant was either the principal offender or, if not the principal offender, that appellant was an aider and abettor. We note that appellant failed to object to the instruction and thus has waived all but plain error. Appellant asserts that, pursuant to *State v. Johnson* (1989), 46 Ohio St.3d 96, 104, 545 N.E.2d 636, 644, if a single count of the indictment can be divided into two or more distinct conceptual groupings, the jury must be specifically instructed that it must unanimously conclude that the defendant committed acts falling within one particular grouping in order to reach a guilty verdict. Our response to appellant's argument is threefold.

First, in *Johnson* we indicated that a specific instruction is necessary when there exists the possibility of a "patchwork" or less than unanimous verdict. *Id.* at 105, 545 N.E.2d at 645. *Johnson* involved an R.C. 2929.04(A)(7) specification, which requires a finding of either principal offender or prior calculation and design before death can be imposed. In contrast, the specification at issue here, R.C. 2929.04(A)(4), requires only that the murder was perpetrated by appellant while he was a prisoner in a detention facility. R.C. 2929.04(A)(4) makes no distinction between principal offender and aider and abettor.

Second, appellant could be convicted of aggravated murder under R.C. 2903.01(A) as a principal offender, or as an aider and abettor, pursuant to R.C. 2923.03(A). R.C. 2923.03(F) also provides that appellant could be punished as an aider and abettor as if he were the principal offender.

Our third response centers on appellant's additional contention that the failure of a specific instruction deprived him of his right to a reliable sentencing hearing. Appellant contends that such failure prevented defense counsel from asserting, and the jury from considering, the mitigating factor in R.C. 2929.04(B)(6), which permits the jury to consider a defendant's aider and abettor status. However, we find no error, since the evidence was substantial that appellant was a principal offender. There was substantial testimony that the shank in appellant's possession caused two of Watkins's six fatal wounds. We have previously stated that "principal offender" means the "actual" killer and not the "sole" offender. As there can be more than one actual killer, there can thus be more than one

principal offender. *State v. Keene* (1998), 81 Ohio St.3d 646, 655, 693 N.E.2d 246, 256. Accordingly, we find that appellant has not met his burden under the plain error standard and we reject his fourth proposition of law.

## VI

### Proposition of Law No. 5

Appellant argues that the trial court erred in denying him access to the grand jury testimony in his case. While not being entirely clear, appellant appears to be making several overlapping arguments regarding Crim.R. 16(B)(1)(a) and Crim.R. 6(E). Appellant asserts that because his five co-conspirators are "co-defendants" he is entitled to their grand jury testimony, if any, pursuant to Crim.R. 16(B)(1)(a)(iii). Additionally, appellant claims that he had a particularized need, pursuant to *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, and presumably Crim.R. 6(E), for the grand jury testimony in order to determine whether any of his five "co-defendants" testified before the grand jury. Finally, appellant argues that the trial court erred in failing to conduct an *in camera* inspection of the grand jury testimony to ensure compliance with Crim.R. 16. For the following reasons we find appellant's fifth proposition of law not well taken.

Crim.R. 16(B)(1)(a) provides that "[u]pon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect * * *. " * * *

"(iii) Recorded testimony of the defendant or co-defendant before a grand jury."

In *State v. Wickline* (1990), 50 Ohio St.3d 114, 118, 552 N.E.2d 913, 918, we defined "co-defendant" for purposes of Crim.R. 16(B)(1)(a)(iii) as " '[m]ore than one defendant being sued in the same litigation; or, more than one person charged *in the same complaint or indictment* with the same crime.' " (Emphasis added; quoting Black's Law Dictionary [5 Ed.1979] at 233.) Appellant was the only person charged in the indictment in the instant matter with causing the death of Watkins. Therefore, appellant's co-conspirators in the death of the victim were not co-defendants and thus mandatory disclosure of grand jury testimony under Crim.R. 16(B)(1)(a)(iii) is inapplicable.

As to appellant's argument regarding a particularized need, the applicable law is set forth in *State v. Greer, supra.* In *Greer*, at paragraph one of the syllabus, this court held that "[d]isclosure of grand jury testimony, *other than that of the defendant and co-defendant,* is controlled by Crim.R. 6(E), not by Crim.R. 16(B)(1)(g), and release of any such testimony for use prior to or during trial is within the discretion of the trial court." (Emphasis added.) The court further

held that secrecy of grand jury proceedings is to be maintained unless "the ends of justice require it [disclosure] and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *Id.* at paragraph two of the syllabus.

We find that appellant failed to establish a particularized need for the grand jury testimony of his five co-conspirators. Appellant's claim of a particularized need is replete with speculation and innuendo. See *State v. Webb* (1994), 70 Ohio St.3d 325, 337, 638 N.E.2d 1023, 1034. For instance, appellant asserts that the co-conspirators were not called as state witnesses in order "to keep their exculpatory or impeachment testimony from [appellant] on cross-examination." As appellant has failed to demonstrate that the trial court abused its discretion when it denied his motion for grand jury testimony, we reject appellant's fifth proposition of law. See *State v. Maurer* (1984), 15 Ohio St.3d 239; 250, 15 OBR 379, 389, 473 N.E.2d 768, 780–781.

## VII

### Proposition of Law No. 6

Appellant asserts that the trial court erred in failing to remove prospective juror Andre Porter for cause based on Porter's bias in favor of capital punishment. Appellant claims that this error was compounded, since appellant had to unnecessarily use a peremptory challenge to remove Porter and was thus unable to exercise one against juror Carla Stover, who, according to appellant, was "strident[ly]" in favor of the death penalty. We reject appellant's argument based on the following reasons.

Although defense counsel questioned Porter regarding his views on capital punishment, counsel failed to challenge Porter for cause on that basis and instead limited the challenge of Porter to his statements as to the defendant's right not to testify at trial. Therefore, appellant has waived any error, save plain error.

We do not find that the trial judge's failure to, *sua sponte*, excuse Porter amounted to plain error. The voir dire of Porter, taken as a whole, does not lead to the conclusion that Porter was the type of automatic death penalty juror who was criticized in *Morgan v. Illinois, supra.* In fact, the record reflects that Porter would consider the evidence and follow the law as instructed by the trial judge. Further, Porter expressed a willingness to take into consideration other factors, such as defendant's background and the nature and circumstances of the crime, before deciding to render a death verdict. The determination of issues raised in voir dire is within the trial judge's discretion. *State v. Beuke* (1988), 38 Ohio St.3d 29, 39, 526 N.E.2d 274, 285. Moreover, deference must be accorded to the trial judge who sees and hears the juror. *State v. Tyler* (1990), 50 Ohio St.3d

24, 30, 553 N.E.2d 576, 586, citing *Wainwright v. Witt,* 469 U.S. at 426, 105 S.Ct. at 853, 83 L.Ed.2d at 853.

In addition, contrary to appellant's assertion, the record does not reflect that juror Stover was "strident[ly]" in favor of the death penalty. Defense counsel questioned Stover regarding her beliefs on the death penalty. For instance, in responding to defense counsel's inquiry whether she could sentence appellant to a term of thirty years without parole, Stover stated that her decision would be based on evidence presented during the trial. Moreover, the trial judge questioned Stover regarding her beliefs on the death penalty and instructed Stover at length regarding the law on the guilt and penalty phases. Stover clearly indicated that she would follow and apply the law to the facts as instructed. In short, the trial judge took adequate steps to ensure that Stover was in fact an impartial juror.

The trial judge's decision not to remove prospective juror Porter for cause was not outcome-determinative and thus did not amount to plain error. Accordingly, appellant's sixth proposition of law is not well taken.

## VIII

### Proposition of Law No. 7

Appellant contends in his seventh proposition of law that the prosecutor improperly "coached" a witness to identify a certain exhibit as the murder weapon. At trial, corrections officer Browning testified that after appellant and five other inmates entered the Adams A unit of Madison Correctional, appellant held a shank knife to his throat and forced him to surrender the keys to the jail cells. Browning further testified that he was able to view the shank that appellant held to his throat. The prosecutor then directed Browning to walk over to a table in the courtroom where six shank knives were displayed as State's Exhibits 2 through 7. The prosecutor then asked Browning whether he recognized any of those knives as the knife appellant held in his hand as appellant entered the Adams A unit. Browning replied: "Yes." The prosecutor then asked: "Could you point it out to us, please? State's exhibit 3?" Browning answered: "Yes." The prosecutor further inquired: "Is there [*sic*] the knife he held to your throat?" Browning again responded: "Yes." At that point the state concluded its direct examination of Browning.

Appellant asserts that the above passages from the transcript indicate that prior to identifying the exhibit, Browning's attention was improperly directed by the prosecutor to State's Exhibit 3. According to appellant, this incident had prejudicial implications that reached beyond Browning's testimony because the trial court failed to order a separation of witnesses during appellant's trial. Stated another way, appellant asserts that the prosecutor essentially informed

subsequent witnesses which shank to identify as the weapon in appellant's possession.

Appellant failed to object to the prosecutor's line of questioning. The issue is thus waived except for plain error.

Contrary to appellant's assertions, the transcript passages at issue are subject to more than one interpretation. Appellant argues that the prosecutor suggested or coached Browning as to which shank to identify as belonging to appellant. However, the transcript could also be reasonably interpreted to mean that the witness pointed to the shank marked State's Exhibit 3 and the prosecutor merely verbalized the choice made by Browning to verify that it was indeed his choice. Unfortunately, the record does not reflect that Browning was pointing to or indicating a particular shank. In any event, several other witnesses gave a description of the knife in question and testified that this particular shank, State's Exhibit 3, was in fact in the possession of appellant.

Although appellant argues that Browning's identification of appellant's weapon somehow tainted identifications made by subsequent witnesses due to the lack of any separation of witnesses, appellant fails to demonstrate that the subsequent witnesses were in fact in the courtroom during Browning's testimony. We find that appellant has failed to demonstrate that but for the alleged error, the outcome of his trial clearly would have been otherwise. Accordingly, we find no plain error here.

## IX

### Proposition of Law No. 8

Appellant claims that the trial court admitted improper testimony of inmate Andre Wright during the trial phase. Appellant submits that Wright's testimony contained improper speculation and, beyond that, Wright's testimony concerning the mindset of the victim and the intent of the accused constituted improper testimony by a lay witness.

Appellant again failed to object to the prosecutor's line of questioning. Therefore, the issue is waived except for plain error.

Appellant asserts that Wright improperly speculated about events that transpired in Watkins's cell when Wright stated that "I guess they stuck him [Watkins] a couple times while inside the cell * * *." We disagree. Wright testified that he immediately observed blood on Watkins as Watkins escaped from his cell. State's Exhibit 18 indicates a trail of blood that begins directly outside Watkins's cell. Wright subsequently witnessed appellant pursuing Watkins throughout the Adams A compound and repeatedly stabbing Watkins. It was hardly speculation for Wright to conclude that appellant stabbed Watkins

inside the cell. In any event, as the state points out, since Watkins was stabbed forty times, Wright's testimony, even if improper, was not outcome-determinative.

Appellant further contends that Wright's testimony regarding Watkins's mindset was improper testimony by a lay witness. Evid. R. 701 states that "[i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those * * * which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." Wright's statement did not constitute improper testimony by a lay witness. Wright's statement that Watkins was "scared" and "not able to think" was rationally based on Wright's perception of events transpiring before him, specifically watching Watkins running for his life while being attacked, and was therefore helpful in explaining Wright's perceptions.

Wright also testified that appellant "came in with intention to kill." Defense counsel did not object to this statement. Appellant now claims that this testimony was "improper." However, Wright's statement concerning appellant's intent at the time of the murder, even if improper, does not rise to the level of plain error. Wright's statement clearly did not affect the outcome of the trial. The evidence of appellant's intent to kill was established by overwhelming evidence at trial.

## X

### Proposition of Law No. 9

In proposition of law nine, appellant alleges that the trial court, in two instances, admitted the testimony of corrections officers that constituted improper hearsay. In the first instance, corrections officer Terry Campbell testified that, after the murder, there was a lot of conversation taking place in the prison yard between appellant and the juvenile inmates in the Adams A unit. The prosecutor asked Campbell whether appellant was talking to a black inmate. Campbell replied: "The black guy said * * * '[w]hat are you going to—* * *.'" Defense counsel objected to "what the black guy said." The trial court overruled the objection. Campbell then answered: "He [the black inmate] asked, 'What are you going to do now, Whitey?'" We find that this was not hearsay, since the declarant in this instance was clearly not making an assertion. See Evid.R. 801(A). In the second instance complained of by appellant, corrections officer John Vanover was asked whether he heard appellant make any statements after he was apprehended outside the Adams A unit. Vanover replied, "[appellant] was yelling to inmates that were still locked in their cells in Adams A and some of them had yelled out to him he was a murderer, et cetera." Defense counsel

failed to object to Vanover's statement, therefore any error was waived, save plain error. We find no plain error.

## XI

### Proposition of Law No. 10

Appellant argues that R.C. 2929.03(D)(1) and 2929.04 are unconstitutionally vague, both facially and as applied. Appellant contends that the interplay between R.C. 2929.03(D)(1) and 2929.04(B) incorporates the nature and circumstances of an offense into nonstatutory aggravating circumstances.

We have addressed contentions such as those appellant raises here numerous times in the past and have upheld the statutory scheme. As we have previously stated, R.C. 2929.03(D)(1) requires that in a capital jury trial, the court and the jury consider testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstance(s) the offender was found guilty of committing. *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 353, 662 N.E.2d 311, 320. However, "the nature and the circumstances of the offense may only enter into the statutory weighing process on the side of *mitigation*." (Emphasis *sic*.) *Id.* at 356, 662 N.E.2d at 322. Viewing the trial court's penalty phase instructions in their entirety, we find no error, plain or otherwise.

Additionally, the state's closing argument did not, as appellant suggests, improperly draw the jury's attention to the nature and circumstances of the crime. During the penalty phase of a capital trial, counsel for the state may introduce and comment upon "evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant." *State v. Gumm* (1995), 73 Ohio St.3d 413, 421, 653 N.E.2d 253, 263. Here, the state merely referred to various evidence in an effort to rebut mitigating factors raised by the appellant. The prosecutor separated his discussion of the statutory aggravating circumstance from his discussion of the nature and circumstances of the crime, and thereby "exercise[d] an abundance of caution to avoid suggesting or implying that the nature and circumstances of the offense are 'aggravating circumstances.'" *State v. Wogenstahl,* 75 Ohio St.3d at 358, 662 N.E.2d at 323.

Finally, contrary to appellant's contention, we find that the trial judge's sentencing opinion did not offend the dictates of Ohio's capital sentencing scheme. Accordingly, we deny appellant's tenth proposition of law.

## XII

### Proposition of Law No. 11

In proposition of law eleven, the appellant raises claims of prosecutorial misconduct. Appellant alleges that the prosecutor committed several acts of

misconduct during the trial and sentencing phases, which deprived appellant of a fair trial and a reliable sentence. Appellant, having failed to object to any of the alleged instances of prosecutorial misconduct, has waived all but plain error. Appellant's most compelling argument in this regard centers on his assertion that the prosecutor shifted the burden of proof at the penalty phase. During the sentencing hearing, the prosecutor's closing argument did contain statements mischaracterizing the proper standard for weighing the aggravating circumstance and mitigating factors. However, as previously noted, appellant's arguments have been waived. In any event, the trial court cured any alleged error by correctly instructing the jury on the weighing process. Specifically, the trial court instructed that "[t]he state has the burden of proving by proof beyond a reasonable doubt that the aggravating circumstance that the defendant was found guilty of committing is sufficient to outweigh the factors in mitigation of the sentence of death[,]" and "[i]n the context of this case, does the aggravating circumstance outweigh the mitigating factors beyond a reasonable doubt[,]" and again, "you [the jury] must unanimously agree that the prosecutor has proven to you beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors * .* *." Further, the verdict forms, which the court reviewed with the jury, also described the correct weighing process. Any perceived error concerning the prosecutor's misstatements was clearly harmless. See *State v. Greer* (1988), 39 Ohio St.3d 236, 251, 530 N.E.2d 382, 400. Therefore, having reviewed the record thoroughly, we conclude that none of appellant's arguments, taken singularly or together, rises to the level of plain error.

## XIII

### Proposition of Law No. 12

In proposition of law twelve, appellant questions the trial court's guilt phase jury instructions. Specifically, appellant argues that the trial court's jury instructions created a mandatory rebuttable presumption of appellant's purpose or intent to kill. Appellant further claims that the instructions undermined the *mens rea* element of aggravated murder by interjecting the civil standard of foreseeability. See *State v. Burchfield* (1993), 66 Ohio St.3d 261, 263, 611 N.E.2d 819, 820–821. Last, appellant argues that the trial court's guilt phase instructions impermissibly shifted the burden of proof to him.

Appellant failed to raise these issues in the trial court and, therefore, each claim has been waived absent plain error. The court has previously addressed similar arguments concerning the trial court's use of the foreseeability standard in murder-case jury instructions, and we conclude here that the trial court's instructions in this instance do not rise to the level of reversible error. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 100, 656 N.E.2d 643, 668. As to appellant's

remaining contentions under this proposition, having considered the trial court's instructions to the jury in their entirety, we find no error prejudicial to the appellant. Accordingly, we reject appellant's twelfth proposition of law.

## XIV

### Proposition of Law No. 13

The matter raised by appellant in proposition of law thirteen has been addressed and rejected in a number of our prior cases. See, *e.g., State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80–81, and *State v. Raglin* (1998), 83 Ohio St.3d 253, 260, 699 N.E.2d 482, 489.

## XV

### Proposition of Law No. 14

Appellant asserts that he was denied a fair trial when the court permitted the jury to replay the crime scene videotape during its trial-phase deliberations. Appellant further contends that the trial court should have instructed the jury not to unduly emphasize the videotape during its deliberations. We disagree.

Ohio courts follow the majority rule that permits the replay of a videotape exhibit during jury deliberations. *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 641 N.E.2d 1082, 1103. Appellant's claims of prejudicial effect are not supported by the record. The appellant was not pictured on the videotape. Moreover, the trial court admitted the videotape into evidence only on the stipulation that the last scene (the victim lying in a pool of blood) be edited to reflect only what was shown to the jury in the courtroom. Specifically, the trial court instructed that this scene be edited to a few seconds' view of the victim. No objection was made either to the trial court's admittance of the videotape or to the jury's request to replay the videotape during its deliberations. Since the videotape was properly admitted into evidence, and the trial court took precautions to limit any potential prejudicial effect, we find no reversible error in the jury's second viewing of the videotape. See *State v. Clark* (1988), 38 Ohio St.3d 252, 257, 527 N.E.2d 844, 851.

## XVI

### Proposition of Law No. 15

Appellant claims that the trial court considered an improper expression of opinion by the victim's grandmother as to whether appellant deserved the death penalty. Appellant points to language in the judgment entry imposing the death sentence and argues that the trial court impermissibly relied on the victim-impact statement. We disagree. A review of the transcript and sentencing opinion reveals no indication whatsoever that the trial court relied on the victim-impact

statement in rendering the sentence of death. Absent an affirmative showing to the contrary, this court will presume that the trial judge considered only the relevant, material, and competent evidence in arriving at a judgment. *State v. Dennis* (1997), 79 Ohio St.3d 421, 433, 683 N.E.2d 1096, 1107. The mere reference to the victim-impact statement in the trial court's judgment entry, without more, does not amount to reversible error. We reject appellant's proposition of law.

## XVII

### Proposition of Law No. 16

In proposition of law sixteen, appellant asserts that the trial court, in its sentencing opinion, inappropriately considered public policy matters, treated the aggravating circumstance as a mandatory death sentence, failed to weigh relevant mitigating evidence, and used the wrong standard in considering mitigating evidence. We have stated in several of our previous cases that any alleged errors in the trial court's sentencing opinion may be cured by this court's independent review of appellant's death sentence. See, generally, *State v. Lott* (1990), 51 Ohio St.3d 160, 170–173, 555 N.E.2d 293, 304–307. See, also, *State v. Fox* (1994), 69 Ohio St.3d 183, 191–192, 631 N.E.2d 124, 131, and *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684–685, 687 N.E.2d 1358, 1373. We continue to adhere to our position on this issue.

## XVIII

### Proposition of Law No. 17

Appellant claims that the trial court erred in its "reasonable doubt" instructions at both the trial and sentencing phases. With respect to the trial phase instruction, the court has repeatedly upheld the definition of "reasonable doubt" set forth in R.C. 2901.05. See *State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus, and *State v. Frazier* (1995), 73 Ohio St.3d 323, 330, 652 N.E.2d 1000, 1008. Regarding the penalty-phase jury instruction, appellant concedes that claims similar to those he raises here have been previously considered and denied by this court. Accordingly, proposition of law seventeen is rejected. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

## XIX

### Proposition of Law No. 18

The matter raised in appellant's proposition of law eighteen is rejected on authority of *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d

984, paragraph three of the syllabus. To appellant's credit, he acknowledges this court's holding in *Rogers* and concedes that this proposition has been advanced solely for the purpose of preserving the issue for review on federal habeas corpus.

## XX

### Proposition of Law No. 19

We have repeatedly held that Ohio's death penalty laws are constitutional. See, *e.g., State v. Jenkins,* 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Maurer,* 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Zuern* (1987), 32 Ohio St.3d 56, 512 N.E.2d 585; *State v. Davis* (1992), 63 Ohio St.3d 44, 584 N.E.2d 1192; *State v. Taylor* (1997), 78 Ohio St.3d 15, 676 N.E.2d 82. Appellant's argument that Ohio's death penalty statutes are in violation of treaties to which the United States is a signatory, and thus offends the Supremacy Clause of the United States Constitution, were specifically rejected in *State v. Phillips,* 74 Ohio St.3d at 103–104, 656 N.E.2d at 671. Further, appellant's arguments challenging the direct appeal provisions of the Ohio Constitution were rejected in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668, syllabus.

## XXI

Having considered appellant's propositions of law, we must now independently review the sentence of death for appropriateness (also raised in appellant's Proposition of Law No. 2) and proportionality.

We find that the aggravating circumstance appellant was found guilty of committing, R.C. 2929.04(A)(4), was proven beyond a reasonable doubt.

In mitigation, appellant's stepfather, John Untermoser, his sister, Denise Crosston, his stepsister, Lorrie Holdreith, and his brother-in-law, Timothy Holdreith, testified concerning appellant's history, character, and background.

Appellant's stepfather, John Untermoser, testified that appellant was raised by his grandmother and his mother. Untermoser stated that there was constant conflict between appellant's mother and grandmother on how to raise him. The stepfather indicated that he never developed a close relationship with the appellant and that he and appellant seldom communicated after appellant became incarcerated. Despite the lack of communication, Untermoser also testified that he always cared for appellant and never knew him to be a violent person.

Appellant's brother-in-law, Timothy Holdreith, testified that he knew appellant for approximately thirteen years, since appellant was in his early thirties. Timothy visited appellant in prison once a month for about eight years and stated that appellant lived with him and his wife (appellant's stepsister Lorrie) for six

months when appellant was on parole. Timothy testified that he never saw appellant lose his temper or act violently against anybody and that appellant "always seemed to be caring in showing love and support for his family."

Lorrie Holdreith testified that appellant was very protective and caring and that he was a "good brother." Lorrie indicated that appellant never had a formal education, and she recalled that most of appellant's adult life was spent in prison. Lorrie additionally stated that she never saw appellant commit a violent act.

Denise Crosston, appellant's sister, testified that when appellant was a young boy he witnessed his grandfather's suicide. Crosston described appellant as a thief who, while growing up, would bring home stolen items to try to make his mother happy. Crosston testified that appellant was "always institutionalized," that she knew appellant best while they were growing up, and that she built a relationship with appellant by visiting him in prison and making sure he had money in his prison account. She further testified that appellant had both of his ankles broken as a result of a prison fight. Crosston also recalled that appellant had his throat cut while in prison. She expressed her view that appellant is not a murderer but "is a product of the environment that he is in."

Eberhard Eimer, Ph.D., a professor of psychology at Wittenberg University and a clinical psychologist, also testified on appellant's behalf. Dr. Eimer met with appellant on two occasions at the London Correctional Institution for approximately ten and one-half hours. Dr. Eimer also interviewed Lorrie Holdreith and appellant's girlfriend of ten years, Diane Ash, and additionally performed psychological testing.

Dr. Eimer administered or attempted to administer a total of four tests. Dr. Eimer concluded from the testing that appellant adjusts poorly to "life circumstances" and that appellant tends to have an exaggerated conception of his capability, is highly suspicious, and is alienated from himself and from society. In Dr. Eimer's opinion appellant is capable of being aggressive, is easily provoked, is constantly worried and scared for his life, and is intensely fearful and on guard. Dr. Eimer also expressed his belief that appellant sees the world as a threatening place and suffers from long-term depression.

Through interviews with appellant, Lorrie Holdreith, and Diane Ash, Dr. Eimer elicited further information regarding appellant's history and background. Dr. Eimer testified that appellant's mother worked as a barmaid and appellant's father was a laborer, a musician, and an alcoholic, whom appellant saw a total of three times. Appellant was raised primarily by his grandparents until age five, at which point the grandfather committed suicide.

Dr. Eimer testified that appellant's mother thought the most effective way of raising appellant was to strike him when he did something wrong. Dr. Eimer further stated that appellant would thus turn to the grandmother, who protected

appellant from his own behavior and from his mother. Dr. Eimer found that both the mother's and grandmother's methods of child rearing were highly unhealthy.

Dr. Eimer further noted that appellant has spent much of his adult life in prison. According to Dr. Eimer, appellant became a "citizen of the institution," and abided by rules such as "if one is threatened, one also has a choice to die or to kill." In contrast, Dr. Eimer considered appellant's earning his G.E.D. and receiving an associate degree from Ashland University to be quite an achievement in light of appellant's limited intellectual potential.

Based on the psychological testing of appellant as well as the clinical interviews with appellant, his stepsister, and girlfriend, Dr. Eimer concluded that appellant is "not socialized in terms of moral norms." According to Dr. Eimer, appellant lacked adequate parenting in his formative years and appellant's adult role models were abusive and amoral. Dr. Eimer further noted that appellant is "even more dysfunctional in our society," given that appellant was "institutionalized" at an early age and spent much of his adult life in jail.

In addition, Dr. Eimer diagnosed appellant as suffering from Post–Traumatic Stress Disorder ("PTSD") and determined that appellant has a paranoid schizoid personality with antisocial tendencies. According to Dr. Eimer, appellant's difficulty in adjusting to societal roles is comparable to that experienced by some survivors of military combat. In Dr. Eimer's view, appellant's PTSD and personality disorder qualify as a mental disease. Nevertheless, Dr. Eimer ultimately concluded that appellant holds himself accountable for his actions. Dr. Eimer opined that although appellant "is largely unfamiliar with our [society's] moral norms * * * that doesn't mean that he doesn't know them. * * * [Appellant] knows what he is doing but he has not internalized our societal norms."

Appellant gave a rather lengthy unsworn statement in which he chronicled his life history both in and out of prison. Appellant recounted the time his grandfather committed suicide, how appellant began stealing at an early age, and when he visited his dying mother in the hospital accompanied by prison guards.

Appellant also gave his version of the events leading up to the murder of Watkins. According to his statement, appellant had promised to protect Doug Haggerty, a juvenile inmate at Madison Correctional. Apparently, Haggerty's father and appellant were once cellmates at Lucasville Correctional Institution. Appellant stated that he was informed that Watkins, and other juvenile inmates, had attacked Haggerty. Appellant also stated that he was informed that Watkins had threatened appellant and other members of the Aryan Brotherhood. Appellant alleged that his only intention was to answer Watkins's threat with a fight, but that "things got out of control."

Appellant concluded his unsworn statement by extending sympathy to Watkins's family and by expressing sorrow for his (appellant's) part in Watkins's murder. Finally, appellant asked the court and God to forgive him and have mercy on his life.

Upon a review of the evidence in mitigation, we find that the nature and circumstances of the offense do not reveal any mitigating value. The murder of Watkins took place in a detention facility amidst an atmosphere full of racial animosity. Appellant and five fellow inmates seized control of the juvenile unit at knifepoint and then tracked down and repeatedly stabbed their intended victim. Finally, as Watkins pleaded for his life, appellant and another inmate cornered Watkins and stabbed him to death.

The record does reflect, however, that appellant had a troubled childhood. At the age of five years, appellant witnessed his grandfather's suicide. Testimony established that appellant's formative years were marked by a lack of proper supervision and parental guidance, that appellant was subjected to conflicting methods of discipline from his mother and grandmother, and that appellant lacked a formal education. We believe that appellant's childhood and other history are entitled to some weight in mitigation.

We now consider the statutory mitigating factors listed in R.C. 2929.04(B). The R.C. 2929.04(B)(4) and (5) mitigating factors are not applicable on the record before us. R.C. 2929.04(B)(6) is also inapplicable because evidence produced at trial overwhelmingly established that appellant was a principal offender in the death of Watkins.

In his second proposition of law, appellant asserts that, in view of the fact that he suffers from PTSD, Watkins's attack on Haggerty induced or facilitated Watkins's death. Moreover, appellant contends that Watkins's threat to kill appellant, coupled with appellant's PTSD, caused him to be under duress and triggered or provoked Watkins's own murder. We disagree.

The fact that appellant apparently suffers from PTSD compels very little weight, if any, in mitigation under R.C. 2929.04(B)(1) or (2). Although Dr. Eimer diagnosed appellant as suffering from PTSD, Dr. Eimer also added that appellant "knows what he is doing" and that appellant holds himself accountable for his actions.

The fight that involved Watkins and Haggerty could perhaps be construed under other circumstances as having motivated appellant and his accomplices to seek revenge against Watkins. However, in light of overwhelming evidence to the contrary, this court finds that this incident was merely an excuse used by appellant to achieve other ends. Testimony at trial established that appellant wanted to get transferred out of Madison Correctional and had his belongings already packed when prison officials went to his cell after the murder. Further,

shortly after killing Watkins, appellant told corrections officer Vanover something to the effect that "this will definitely get me my ride out (of Madison Correctional)." We therefore conclude that the R.C. 2929.04(B)(1) mitigating factor is not implicated here.

In addition, the R.C. 2929.04(B)(2) mitigating factor is entitled to little or no weight. There was no direct provocation by Watkins against appellant. Appellant failed to establish that he was under a threat of imminent harm from Watkins. After the assault on Haggerty and alleged threat by Watkins, appellant had sufficient time to consider his course of action. Watkins's purported threat to appellant, as well as the assault on Haggerty, is a weak attempt by appellant to justify his use of deadly force. Moreover, as previously stated, the evidence at trial established that appellant committed the murder to compel a transfer out of Madison Correctional. It was further established at trial that the murder of Watkins was also intended to send a message to the black juvenile inmates at Madison Correctional that the Aryan Brotherhood would not be intimidated.

We also conclude that Dr. Eimer's diagnosis of appellant's mental condition is not entitled to weight under R.C. 2929.04(B)(3). Dr. Eimer agreed that appellant's mental condition was, in fact, a "mental disease." However, Dr. Eimer never asserted, and we do not find, that appellant's mental condition caused him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. See State v. Lawrence (1989), 44 Ohio St.3d 24, 32, 541 N.E.2d 451, 460. Accordingly, we conclude that appellant's paranoid schizoid personality with antisocial tendencies and his PTSD are entitled to only modest mitigating weight as R.C. 2929.04(B)(7) mitigating factors.

In regard to other R.C. 2929.04(B)(7) factors, appellant apparently cares for his family and they for him. Nonetheless, their relationship reveals nothing of any mitigating value. Finally, appellant's expressions of sorrow and remorse in his unsworn statement are entitled to some, but very little, weight in mitigation. See State v. Rojas (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376, 1387, and State v. Raglin, 83 Ohio St.3d at 273, 699 N.E.2d at 498.

Weighing appellant's evidence presented in mitigation against the single R.C. 2929.04(A)(4) aggravating circumstance, we conclude, beyond a reasonable doubt, that the aggravating circumstance outweighs the mitigating factors. Therefore, the penalty of death is statutorily appropriate.

As a final matter we find that the death penalty imposed in this case is neither excessive nor disproportionate to similar cases where the offender committed murder while a prisoner in a detention facility. See, e.g., State v. Zuern, 32 Ohio

St.3d 56, 512 N.E.2d 585, and *State v. Carter* (1992), 64 Ohio St.3d 218, 594 N.E.2d 595.

Accordingly, for the foregoing reasons, we affirm appellant's conviction and death sentence.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

## APPENDIX

"*Proposition of Law No. I:* During jury selection in a capital case, the trial. court must ask each prospective sentencing juror whether the juror's views on the death penalty would prevent or substantially impair the juror's ability to consider a life sentence if the defendant is found guilty of aggravated murder and the aggravating circumstance. Life qualification of each prospective juror is required whenever the trial court death qualifies the jurors by asking them if their views of the death penalty would prevent or substantially impair their ability to consider the death penalty in the case before them.

"*Proposition of Law No. II:* John Stojetz's death sentence is inappropriate. Damico Watkins['s] death resulted from his own threats against Stojetz and Stojetz's post-traumatic stress disorder.

"*Proposition of Law No. III:* When trial counsel fail to conduct an adequate voir dire, fail to object to inadmissible evidence, fail to request a separation of witnesses, fail to conduct an adequate investigation of the case, fail to object to victim impact evidence, present a confusing explanation of the mitigation weighing process, fail to adequately present evidence of a capital defendant's post-traumatic stress disorder, and fail to adequately prepare defendant's mitigation expert, a capital defendant is deprived of the right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 16 of the Ohio Constitution.

"*Proposition of Law No. IV:* A capital defendant is denied his rights to a jury verdict, to a fair trial, to due process, to the effective assistance of counsel, and to a reliable and non[-]arbitrary death sentence when the jury returns a general verdict of guilty for aggravated murder without a unanimous finding that the defendant was either the principal offender or an aider and abettor. U.S. Const. Amend. VI, VIII, XIV; Ohio Const. Art. I, §§ 5, 9, 10, 16.

"*Proposition of Law No. V:* The defendant who is death-eligible as either a principal offender or aider and abettor must have access to the grand jury's testimony [*sic* ] when there are five co-defendants and the defendant shows a

particularized need for their testimony. U.S. Const. Amend. XIV; Ohio Const. Art. I, § 16.

"*Proposition of Law No. VI:* A defendant's right to a fair and impartial sentencing jury is denied when the trial court overrules a challenge for cause against a prospective juror who is biased in favor of capital punishment.

"*Proposition of Law No. VII:* When improper identification evidence is presented during a defendant's capital trial the defendant's due process rights as guaranteed by the Fourteenth Amendments [*sic*] to the United States Constitution and § 16, Article I, of the Ohio Constitution are violated.

"*Proposition of Law No. VIII:* Appellant's right to due process is violated when the trial court admits improper testimony in violation of the Fourteenth Amendment to the United States Constitution and § 16, Article I, of the Ohio Constitution.

"*Proposition of Law No. IX:* Appellant's due process and confrontation rights are violated when the trial court admits hearsay testimony in violation of the Sixth and Fourteenth Amendments to the United States Constitution and §§ 10 and 16, Article I, of the Ohio Constitution.

"*Proposition of Law No. X:* Ohio Rev.Code Ann. § 2929.03(D)(1) (Anderson 1996) and Ohio Rev.Code Ann. § 2929.04 are unconstitutionally vague in violation of appellant Stojetz's right against cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I, Ohio Constitution.

"*Proposition of Law No. XI:* When prosecutors misrepresent witness testimony, argue victim impact evidence unrelated to the offense, deny a defendant individualized sentencing, mislead on the definition of mitigation, and shift the burden of proof to the defendant, a capital defendant is denied his substantive and procedural due process rights to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 1, 9, 16 and 20 of the Ohio Constitution. He is also denied his right to reliable sentencing as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

"*Proposition of Law No. XII:* A jury instruction that shifts the burden of proof on the *mens rea* element of aggravated murder to the accused is unconstitutional. U.S. Const. Amend. XIV; Ohio Const., Art. I, § 16. A jury instruction that makes the accused's guilt or innocence the ultimate issue of fact is also unconstitutional. U.S. Const. Amend. XIV; Ohio Const., Art. I, §16.

"*Proposition of Law No. XIII:* A capital defendant's right to a reliable and non[-]arbitrary death sentence under the Eighth and Fourteenth Amendments is

violated when the sentencing jury's responsibility for its verdict is attenuated by the trial court's instructions.

*"Proposition of Law No. XIV:* When a videotape is replayed for the jury, its significance is overemphasized and a capital defendant's due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution and § 16, Article I, of the Ohio Constitution are violated.

*"Proposition of Law No. XV:* It is constitutional error for the trial court to consider victim impact evidence in capital sentencing in the form of an opinion by a victim's family member about the defendant's fate. U.S. Const. Amend. VIII, XIV.

*"Proposition of Law No. XVI:* When the trial court considers public policy matters, treats an institutional killing as requiring a mandatory death sentence, fails to weigh relevant mitigating evidence, and uses inappropriate standards in weighing proper mitigating evidence, a capital defendant is deprived of the right to individualized sentencing and of his liberty interest in the statutory sentencing scheme thus violating rights guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I, of the Ohio Constitution.

*"Proposition of Law No. XVII:* The accused's right to due process under the Fourteenth Amendment to the United Constitution is violated when the state is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

*"Proposition of Law No. XVIII:* The defendant in a capital case has a due process liberty interest in Ohio Rev.Code Ann. § 2945.25(C) (Anderson 1996). The defendant's liberty interest in [R.C. 2945.25(C) ] is infringed when the trial court fails to follow the Revised Code during voir dire on the issue of capital punishment.

*"Proposition of Law No. XIX:* Ohio's death penalty laws are unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev.Code Ann. Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 (Anderson 1996). Ohio's death penalty statute does not meet the prescribed constitutional requirements and is unconstitutional on its face and as applied to appellant Stojetz."