DECISION AND JUDGMENT ENTRY
John Noser brings this appeal from his conviction for murder, a violation of R.C. 2903.02(A), and from the sentence of fifteen years to life imposed by the Lucas County Court of Common Pleas. We hold that the finding of venue in this case was not based upon insufficient evidence, was not against the manifest weight of the evidence and was not based upon an erroneous jury instruction. We further hold that Noser was not deprived of a fair trial and was not entitled to a mistrial due to alleged prosecutorial misconduct in closing and rebuttal closing statements. Finally, we find that the act of permitting jurors to pose questions of witnesses, when done under guidelines designed to protect the accused from any prejudice, is not reversible error. We, therefore, affirm the judgment of the Lucas County Court of Common Pleas in this case.
Noser has presented a total of six assignments of error for consideration. His first five assignments of error are:
 "Assignment of Error No. 1. THERE WAS INSUFFICIENT EVIDENCE OF VENUE IN LUCAS COUNTY TO SUPPORT A VERDICT OF GUILT AND THE JURY'S IMPLICIT FINDING THAT VENUE IN LUCAS COUNTY WAS PROPER IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 "Assignment of Error No. 2. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT CHARGED THE JURY IN THE ALTERNATIVE THAT VENUE COULD BE SATISFIED IF MS. BOROWSKI WAS KILLED IN LUCAS COUNTY OR THAT MR. NOSER HAD THE PURPOSE TO KILL HER WHILE IN LUCAS COUNTY. (TR 1860.)
 "Assignment of Error No. 3. TRIAL COUNSEL'S FAILURE TO OBJECT TO THE COURT'S ERRONEOUS JURY INSTRUCTION AS SET FORTH IN ASSIGNMENT OF ERROR NO. 2 DEPRIVED MR. NOSER OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
 "Assignment of Error No. 4. PROSECUTORIAL MISCONDUCT DURING THE STATE'S CLOSING AND REBUTTAL CLOSING ARGUMENTS DEPRIVED MR. NOSER OF THE FAIR TRIAL TO WHICH HE WAS ENTITLED UNDER THE CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF OHIO.
 "Assignment of Error No. 5. THE TRIAL COURT ERRED IN REFUSING TO GRANT A MISTRIAL ON THE BASIS OF PROSECUTORIAL MISCONDUCT."
With leave of court, Noser filed a supplemental assignment of error which is:
 "A TRIAL COURT COMMITS REVERSIBLE ERROR WHEN IT PERMITS JURORS TO ASK QUESTIONS OF WITNESSES."
Because Noser first challenges his conviction for murder on the basis that a finding of venue is based upon insufficient evidence and is against the manifest weight of the evidence, we begin by reviewing the pertinent facts and procedure in this case.
In November 1999, the grand jury sitting in Lucas County, Ohio, indicted Noser for murdering his former girlfriend, Brenda Borowski, on August 15, 1995. The former girlfriend's body has never been found. The case proceeded to trial. Witnesses called to testify by the state presented the following information.
Noser and the murder victim had a romantic relationship that included Noser living with the victim and her two children in Swanton, Ohio. Problems developed in the relationship because Noser failed to hold a job. The victim ended her relationship with Noser and asked him to move out of her home a couple of months before she disappeared.
Noser left, as requested, and joined two brothers and their uncle in Columbus, Ohio for a week. The men worked together during the day installing swimming pools and stayed together in a hotel room during the night. The uncle and the two brothers all testified that Noser would leave the room to make telephone calls, and that when he returned, he seemed upset. He would repeatedly play his guitar and sing one song over and over again. The song, first recorded by a group called Guns and Roses, was titled "Used To Love Her" and contained lyrics describing how a former lover killed a woman and buried her in his backyard. The two brothers testified that Noser would always conclude the song by saying that he literally meant what he sang. That if he could not have his former girlfriend, no one could have her.
After that one week, Noser quit his job as a swimming pool installer. He contacted an old friend in Middletown, Ohio whom he first met when they were in the military together. The friend took him to Middletown, where Noser got a job operating heavy equipment at a construction site for a new hotel.
A close friend of the murder victim testified that she received several phone calls from Noser from the time Noser and the murder victim broke up until shortly before the date the murder victim was last seen. Noser would beg the victim's close friend to help him repair the broken relationship between himself and his former girlfriend. She said the last time he called her, she finally told him in exasperation that the victim was dating someone else. She testified that she counseled Noser to move on with his life as the victim had done.
The close friend testified that on August 14, 1995, the victim spent the night at her trailer. The last time she saw the victim was early the next morning when the victim was leaving the close friend's trailer to go to work. The close friend testified that the murder victim had two jobs; one as an interior decorator specializing in selling drapery and other window coverings for a department store, and one as a bartender/waitress at a bar. On the morning in question, the victim was leaving for her job at the department store. The victim never reported to work and never went to an appointment at a customer's house.
The victim's son's girlfriend testified that she talked with the victim on the morning of August 15, 1995. She lived in the same trailer park where the victim lived and that is where she saw the victim, outside the victim's trailer. She said she saw that the victim was nicely dressed for work. While they talked, the victim loaded her drapery and other window covering samples into the trunk of her car, along with a small bag containing cosmetics and other personal items.
Evidence introduced by the state showed that on the morning of August 15, 1995, a series of eighteen phone calls were placed to the victim's home starting at 6:51 a.m. and ending at 9:33 a.m. Police officers testified that Noser admitted to them that he made the calls. Records from telephone companies showed that the calls were placed from three different pay phones. The last pay phone was located within sight of the parking area where the murder victim parked when she went to work at the department store.
At ten o'clock that morning, the victim was recorded making a withdrawal from a checking account at an ATM machine in Oregon, Ohio. Testimony showed that the account was held jointly in the names of the victim and Noser, but that only one ATM card was issued for the account. The pictures from the transaction, recorded by a camera at the ATM, show the victim in the driver's seat of her car, and Noser in the passenger seat of her car. That was the last time the victim was seen alive.
Witnesses from Middletown testified about their encounters with Noser starting on August 16, 1995. The first witness testified that Noser appeared at his apartment door the evening of August 16, 1995 and asked him to come to a wooded area near a stream where Noser was camping. He went and drank beer with Noser in the woods. Noser told the witness that he had been in Toledo the day before and that he and the victim were involved in a drug transaction that "went bad" in downtown Toledo. He told the witness that the victim was shot twice and that she was dead. While he was talking, Noser was taking items from the trunk of the victim's car and was burning them in a campfire.
The first witness eventually went home. He called a second witness, who was Noser's buddy from the military who first took Noser to Middletown. The first witness told the second witness of his encounter with Noser.
Earlier that day, the second witness's live-in girlfriend had received a telephone call from the victim's close friend in Swanton, who explained that the victim was missing and asked if anyone in Middletown had seen either the victim or Noser.
On August 17, 1995, the second witness was at work when he was approached by Noser. He testified that earlier that week, prior to August 15, 1995, Noser had asked him to take care of some of Noser's personal property while Noser was out of town. Noser told him he was going to Toledo by bus to get his driver's license renewed. He said that when Noser returned, Noser asked for his property. Noser told the second witness that he had been involved in a shoot-out over a drug deal while in Toledo and that his former girlfriend was killed in the shoot-out. Noser wanted his personal property back so he could leave and go to Colorado. The second witness agreed to return Noser's property to Noser at the campsite in the woods that evening.
The second witness's girlfriend testified that she decided to call the victim's close friend sometime during the day on August 18, 1995. She told the victim's close friend that Noser was in Middletown, had the victim's car, and was camping in a wooded spot, but the victim was not with him.
The victim's close friend called the sheriff in Fulton County, Ohio to relay the information she received from Middletown. The sheriff, in turn, faxed the information to the Middletown Police Department and asked them to check into the reports, explaining that the victim was reported as missing.
The Middletown Police Department personnel complied with the request. A patrol officer drove his cruiser to the wooded area and saw a man, clad only in shorts, run from a camping area set up on the far side of the stream near a car. The man ran into the woods. The officer ran a check on the license plates of the car and learned it was registered to the victim. The steering column of the car was peeled, a sign the officer testified indicated in his experience that the car might be stolen. The officer called for backup and treated the area as a potential crime scene.
The man who ran into the woods eventually emerged from the woods. He was very wet and looked to the officers as though he had been in the stream. The officers present immediately approached him with drawn firearms and ordered the man to the ground. They handcuffed him and then asked him some questions as they walked him toward a cruiser. In response to the questions, he said he was Noser, that he was wet because he was running, that the car belonged to the victim, and that the victim had been killed the day before in a shoot-out in Toledo during a failed attempt to sell six kilos of cocaine.
While the officers were still at the scene with Noser, the second witness from Middletown arrived. He had Noser's possessions and was coming to return them to Noser. He testified that before he left to meet Noser, he told his girlfriend to call the police if he was not back in an hour, because he did not believe Noser's story about a drug deal gone bad and he was afraid of Noser.
Noser was placed under arrest for possession of a stolen vehicle by members of the sheriff's department in Fulton County, Ohio. However, because of venue problems, the charge was dismissed, and Noser was released from custody. Before he was released, Noser waived his rights after being given his Miranda warnings and gave statements to police officers from Middletown and from Fulton County. He also voluntarily talked with the close friend of the victim that Noser had called so many times seeking help to restore his relationship with the victim. Each time, Noser insisted that the victim was dead. He consistently claimed that the victim was shot in the head twice during a shoot-out in Toledo when a drug transaction went bad. He also told a sheriff from Fulton County that he was responsible for the victim's death.
Noser changed some details of his story. For instance, he first said the victim was shot by agents from the Drug Enforcement Agency ("DEA"). However, after the officers told Noser they checked with the DEA and no agents were associated with any shooting in Toledo on August 15, 1995, Noser said the victim was shot by Mafia members who were at the transaction. However, Noser remained consistent in his insistence that the victim was killed in Toledo on August 15, 1995.
Members of various police agencies continued to investigate information related to the disappearance of the victim for several years after Noser was released from custody on the stolen property charge. Officers from Middletown, Toledo and Fulton County conducted several searches trying to find the victim alive or dead.
A few days after Noser was taken into custody, investigators searched the area of Toledo where Noser said the drug transaction and shoot-out took place. Noser even rode along in the police cruiser, but the officers never found any building in the area matching the description given by Noser, and Noser himself told the officers he was probably wasting their time.
Searches were conducted of the stream and the woods near the area where Noser was arrested. Later searches were done in a landfill in the Toledo area. Dogs trained to locate dead bodies were used, but the victim was never found. Investigators did recover several items from the campfire where Noser was found in Middletown. The items included several cosmetic containers, which were identified by the victim's close friend as the type the victim used, two different earrings, which the victim's daughter identified as her mother's, and several samples of drapery which were identified as the kind the victim kept for her job at the department store. No discernable fingerprints were found on any of the items.
Finally, an officer in Middletown got permission to coordinate all of the information held by the various police agencies. The information he compiled from all the agencies involved, and his own additional investigation, revealed that on August 15 and 16, 1995 the victim's ATM card was used at a bank in Middletown. One use was made at 4:07 p.m. on August 15, 1995 at the Middletown bank resulted in a withdrawal of twenty dollars. Four more tries to withdraw funds at the Middletown bank ATM from the victim's accounts on August 16, 1995, were unsuccessful — the withdrawals were denied for nonsufficient funds. In addition, the victim's telephone calling card was used to place two calls from Franklin, Ohio, to Dayton, Ohio, on August 14, 1995, and to place six calls from Middletown, Ohio on August 16, 1995.
The officer also learned that the victim had won a $1000 sweepstakes from a radio station in Toledo before her disappearance. The person in charge of the sweepstakes testified that personnel from the station made several calls to let the victim know the check was at the station after July 8, 1995. However, even though the victim had already completed the necessary paperwork to claim her prize and made plans to go shopping with her mother after she got the money, she never appeared at the station to pick up the check.
The officer also learned that on August 15, 1995, there was an open trench for the installation of a sewer pipe at the construction site of the hotel in Middletown where Noser was working at the time the victim disappeared. The officer surmised it would have been an easy place to bury a body. He learned that the area had not ever been searched and got permission to dig up that portion of the now buried sewer line. However, because of the expense involved, his superiors limited the amount of time the officer could dig. Even though a dog trained to locate dead human remains kept alerting to one spot in the hole, the officer had to discontinue digging because the allotted time ran out before a body was found.
The compiled information was presented to the prosecutor's office in Lucas County, Ohio. The prosecutor presented the case to the grand jury, which resulted in the indictment charging Noser with murder and the subsequent jury trial.
Noser's first three assignments of error are interrelated and will, therefore, be discussed together. Noser contends, in support of his first assignment of error, that the jury's implicit finding that he murdered the victim in Toledo, and that venue therefore rests in Lucas County, Ohio, is against the manifest weight of the evidence. He argues there is no substantial evidence to show that the victim was murdered. He says even if the victim was murdered, there is no substantial evidence to show that the offense took place in Lucas County, only "mere speculation".
Noser acknowledges that in Ohio, venue is proper in any county where any element of the offense takes place. However, he argues that in this case, there is no evidence "whatsoever as to where the offense occurred." He says that the record only shows that when the victim was last seen in Lucas County, making an ATM withdrawal, she was "apparently fine". He argues that since unsuccessful searches were made for the victim's body in four Ohio counties, including Lucas County, there is no evidence to directly tie the element of venue to Lucas County alone.
He says that the two theories presented by the state at trial to establish venue are not persuasive. First, he says that the state's argument that Noser himself said the victim died in Toledo does not establish venue because: 1) he did not say he shot the victim; and 2) the state showed that every part of his statement other than that the victim was killed in Toledo was not believable. Second, he says that the state's argument that Noser had the intent to kill the victim while in Lucas County does not establish venue. He says there is no precedent in Ohio law for the proposition that merely forming the mens rea to commit a crime is sufficient to establish venue.
In a related argument, Noser argues in support of his second assignment of error that plain error occurred when the trial court gave a jury instruction that he contends gave the jury an alternate basis for finding venue in this case. The jury instruction of which he complains was:
 "Venue. The State of Ohio must also prove the element of venue. When it appears beyond a reasonable doubt that any offense or any element of any offense was committed in any two or more jurisdictions, but it cannot reasonably be determined in which jurisdiction the offense or element was committed, the defendant may be tried in any of those jurisdictions.
 "If you find beyond a reasonable doubt that the offense or any element of the offense; that is, the purpose to cause the death of Brenda Borowski and/or the death of Brenda Borowski occurred in Lucas County, Ohio, venue is proper."
Noser argues that this instruction improperly permitted the jury to decide that venue existed either because it decided that he killed the victim in Lucas county or that he formed the purpose to kill the victim while he was in Lucas county. He contends that this permitted that jury to reach a "patchwork verdict" with a portion of the jury deciding that he killed the victim in Lucas county and with another portion of the jury deciding that he merely had the purpose to kill the victim while he was in Lucas County.
Finally, in support of his third assignment of error, Noser argues that he received ineffective assistance of counsel because his trial counsel did not object to the above quoted jury instruction. He contends that the jury instruction was both erroneous and prejudicial.
The Supreme Court of Ohio has established the following standard for an appellate court considering an argument based upon the manifest weight of the evidence:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' Blacks supra, at 1594.
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. * * *" State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
Applying the above standard to the facts of this case, this court does not disagree with the jury's resolution of the evidence presented in this case for the following reasons.
First, we note that the jury instruction given in this case regarding venue is drawn from the statutory provisions found in R.C. 2901.12(G) which are:
 "(G) When it appears beyond a reasonable doubt that an offense or any element of an offense was committed in any of two or more jurisdictions, but it cannot reasonably be determined in which jurisdiction the offense or element was committed, the offender may be tried in any of those jurisdictions."
In a murder case where the victim's body was found, but events leading up to the murder took place in more than one county of Ohio, the Supreme Court of Ohio quoted the above statutory provision relating to establishing venue. State v. Smith (2000), 87 Ohio St.3d 424, 435-437. The Supreme Court then ruled that where the facts showed that the murderers formed prior calculation and design in one county and actually murdered the victim in another county, venue was proper in either of the two counties. Id. at 436-437. The Supreme Court said:
 "In our view, it is clear that the whole sequence of events culminating in [the victim's] murder occurred in two counties. In essence, appellant is arguing that the evidence was insufficient to support venue in Lorain County. In reviewing a record for sufficiency, `the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560. `The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts.' State v. DeHass (1967), 10 Ohio St.2d 230, 39 Ohio Op.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.
 "Here, the jury could reasonably find that prior calculation and design took place in Lorain County, and, as a result, venue in Lorain County was proper. While venue is not a material element of the crime, there was ample and sufficient evidence for the jury to reasonably conclude that getting [the victim] in the car to ride with the appellant and Jalowiec to Cleveland to buy crack, as well as the plan to have [the victim] take a bus out of town, was merely a ruse to kill him in an area where his corpse could not be identified." Id. at 436-437.
After reviewing the facts in the case at bar and comparing them to the facts under consideration in State v. Smith, id., we conclude that the facts in the case at bar are legally sufficient to support a finding of venue. See, also, State v. Christman (May 28, 1999), Monroe App. No. 786, unreported. The legally sufficient facts include: 1) Noser's statements to co-workers while in Columbus that he literally meant words he sang about killing his girlfriend, that if he could not have her he would ensure no one else could have her either; 2) Noser's repeated calls to the victim's close friend asking for help to repair his relationship with the victim that ended when he learned the victim had a new boyfriend and that never again occurred after the victim disappeared; 3) Noser traveling to Toledo by bus the day before the victim's disappearance; 4) Noser's statements that after his arrival in Toledo he purchased a handgun, which he said he fired while being involved in a shoot-out over a drug deal gone bad that resulted in the victim's death; 5) Noser being unable to account for where he was between the time of his arrival and the time he was photographed with the victim in Oregon, Ohio; 6) Noser placing a series of eighteen telephone calls from pay phones(the last at a location where the victim would have parked to go to work) to the victim's home during the early morning hours of the last day she was seen alive, ending shortly before he and the victim were recorded making an withdrawal from a bank account at an ATM; 7) Noser saying that the victim died in Toledo and that he was at fault for her death.
Furthermore, applying the test for manifest weight, we cannot conclude that the jury went astray or that its finding of venue was against the manifest weight of the evidence. Noser himself made statements that the victim died in Toledo and that he was responsible for her death. Even though the state was able to show that many other aspects of the statements made by Noser were not credible, i.e. no DEA agents were involved in a shoot-out in Toledo as he claimed, and no building could be found in the area where he said the events took place that matched the description he gave, the jury was free to find credible his statements that the victim died in Toledo and that he was responsible for her death, while finding other portions of his statements not credible. Furthermore, even if the jury did not conclude that the victim was actually murdered in Lucas County, as we have already discussed, there was plenty of direct and circumstantial evidence to show that Noser began a series of actions in Lucas County that placed him and the victim together and that led to her death at his hands.
Second, because Noser did not object to the jury instruction on venue at trial, he has waived all but plain error. See, State v. Bates (Mar. 30, 2001), Portage App. No. 99-P-0100, unreported. We must therefore evaluate the complained of instruction to see if "but for the error, the outcome of the proceeding would have been different." Id. Noser's contention that a "patchwork" approach could have been used by the jury to find venue in this case is unpersuasive because: 1) it is at most speculative that the jury differed on its reasons for finding that the element of venue was proved beyond a reasonable doubt; and 2) even if we assume arguendo that some of the jurors believed that Noser only had purpose to kill the victim in Lucas County, as demonstrated by the actions he began there, and that the remaining jurors believed that Noser actually killed the victim in Lucas County, all the jurors would, of necessity, have agreed that Noser did have purpose to kill the victim in Lucas County. Noser was charged with purposely causing the death of the victim (R.C. 2903.02(A)), so purpose to kill is subsumed within the actual act of killing. Therefore, the specter of a "patchwork" verdict is not at issue in this case. See, State v. Stojetz (1999),84 Ohio St.3d 452, 458; and State v. Bates (Mar. 30, 2001), Portage App. No. 99-P-0100, unreported.
Finally, we consider Noser's assertion that he received ineffective assistance of counsel when his trial attorney did not object to the jury instruction on venue. He again contends that the instruction on venue was prejudicial because it permitted the jury to reach a "patchwork" verdict.
The Supreme Court of Ohio has ruled:
 "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (State v. Lytle [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; Strickland v. Washington [1984], 466 U.S. 668, followed.)" State v. Bradley (1989), 42 Ohio St.3d 136, 137, paragraph two of the syllabus.
As we have already discussed above, the complained of jury instruction was not prejudicial. Therefore, Noser's assertion that he received ineffective assistance of counsel is not well-taken, and Noser's first, second and third assignments of error are not well-taken.
Noser's fourth and fifth assignments of error are interrelated, as both address whether there was prosecutorial misconduct in this case due to statements made in closing and rebuttal closing arguments by the prosecutor. In his fourth assignment of error, Noser argues that he was denied a fair trial due to prosecutorial misconduct. In his fifth assignment of error, he argues that the trial court erred when it denied his motion for a mistrial due to the prosecutorial misconduct.
The Supreme Court of Ohio has said:
 "Ohio courts have suggested that the effect of counsel's misconduct `must be considered in the light of the whole case.' See, e.g., Mikula v. Balogh (1965), 9 Ohio App.2d 250, 258 [38 O.O.2d 311]. And where misconduct of counsel * * * is of such a prejudicial character that the prejudice resulting therefrom cannot be eliminated or cured by prompt withdrawal, and admonition and instructions from the court to the jury to disregard it, a new trial should be granted, or the judgment reversed, notwithstanding cautions, admonition, and instructions by the trial judge." Book v. Erskine Sons, Inc. (1951), 154 Ohio St. 391, 401
[43 O.O. 334].
 "In general terms, the conduct of a prosecuting attorney during trial cannot be made a ground of error unless that conduct deprives the defendant of a fair trial. State v. Papp (1978), 64 Ohio App.2d 203, 211
[18 O.O.3d 157]; State v. Wade (1978), 53 Ohio St.2d 182, 186 [7 O.O.3d 362]; State v. DeNicola (1955), 163 Ohio St. 140, 148 [56 O.O. 185]; Scott v. State
(1923), 107 Ohio St. 475;, 490-491. This, then, is the point at which we begin in our analysis of this issue.
"* * *
 "[W]e are constrained to keep in mind that '[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced of counsel are occasionally carried away by this temptation.' Dunlop v. United States (1897), 165 U.S. 487, 498.
 "Recently, in State v. Smith (1984), 14 Ohio St.3d 13, we considered another case involving prosecutorial misconduct. We found at 14 that the prosecutor's personal attacks and accusations against defense counsel went so far beyond `the normal latitude allowed in closing arguments' that a fair trial was made impossible. In Smith, the prosecution argued that its improper comments were harmless in view of the sufficiency of the evidence to sustain a conviction. It further contended that prejudice was eliminated because the jury was instructed that closing arguments were not evidence. In light of the circumstances of the case, we found these claims to be without merit, and held: "[T]he general instruction that arguments of counsel are not to be considered as evidence was insufficient to correct the error. * * * In view of the fact that improper insinuations and assertions of personal knowledge by the prosecution are apt to carry great weight against the accused when they should properly carry none * * * some more definite guidance from the court was required." Id. at 15.
 "Important to our disposition of the instant issue is our observation in Smith that `it is not enough that there be sufficient other evidence to sustain a conviction in order to excuse the prosecution's improper remarks. Instead, it must be clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty.' Id." State v. Maurer (1984), 15 Ohio St.3d 239, 266.
Keeping these standards of review in mind, we now consider the closing statements that Noser claims were prejudicial prosecutorial misconduct.
Noser complains of three remarks that the prosecutor made in his closing argument and of six remarks the prosecutor made in his rebuttal closing argument. Noser contends that each of the remarks was prejudicial and that when they are viewed collectively, the trial court could no longer reverse the prejudicial effect with instructions to disregard. He says he was deprived of a fair trial because of the remarks and that he should have been granted a mistrial.
The first remark made by the prosecutor that Noser complains of referred to Noser's demeanor in court when the earrings discovered in the campfire were presented as evidence during trial. The prosecutor said:
 "In fact, when those earrings were brought out in court, the eyes of the jury revealed exactly what they saw. Many of you were watching defense table when those exhibits were presented to the defense to look at. Many of you saw the reactions that came from defense table."
Noser's trial counsel objected to the prosecutor's remark on the basis that Noser's demeanor during trial was not evidence. The trial court sustained the objection and gave the jury an instruction to disregard the comment of the prosecutor.
The next remark Noser says was prejudicial was a reference the prosecutor made to another murder case that had recently been tried in Lucas County in which the accused serial murderers had not been brought to trial until many years had passed from the time the murders were actually committed. The prosecutor was attempting to explain that there is no statute of limitations in a murder case, and that murder trials may be many years distant from the date of the murder. The prosecutor referred to the serial murder's trial as an example. Noser's trial counsel objected to the line of argument, and the trial court sustained the objection. The trial court again instructed the jury to disregard the comment. Noser contends that the remarks were "at least inferentially" inflammatory and were an attempt to make the jury believe there was some kind of likeness between the two cases.
A third remark Noser says was prejudicial was a statement by the prosecutor that the state did not have the burden to produce the victim's dead body. Again, the record shows that Noser's trial counsel objected to the prosecutor's attempt to explain the legal standard and the trial court sustained the objection.
The remarks Noser complains of that were made by the prosecutor in rebuttal closing begin with an incident in which Noser says the prosecutor addressed and demeaned him instead of directing argument to the jury. The prosecutor said:
 "He wants somebody to believe that he is a drug dealer, the two of them are, and they have connections with the Mafia, and it was all a secret life. It was a great secret life because you're the only drug dealer who doesn't have a big car with gold rims. Where is your big house? You live out in the woods."
Noser's trial counsel spoke up and asked the prosecutor to "talk to the jury please." The prosecutor then continued to outline to the jury his argument about why Noser's claims that Noser and the victim were involved in the Mafia and drug dealing were unbelievable.
Next, Noser contends, the prosecutor "attempted to compare this case to others, and to suggest that the jury's verdict would not be final and binding" when the prosecutor referred to the right to appeal. The prosecutor said: "Every time there is a prosecution in a criminal case and there is a conviction, there is an appeal, and when there is an appeal, there is an opinion-". Noser's trial counsel objected, and the trial court sustained the objection.
Noser says the prosecutor tried to personalize the case for the jury and asked them to place themselves in the place of the family in an effort to arouse their passions and sympathy. The remark Noser says was made for the above noted purposes was:
 "The investigation was completed last fall, and now we're here dealing with this case. How long do you want someone to look for your loved one?"
Noser's trial counsel objected. The trial court sustained the objection and gave the jury an instruction to disregard the statement.
Noser says that the prosecutor suggested to the jury that Noser was like the students who killed so many victims at Columbine High School when the prosecutor said:
 "[Noser's trial counsel] has made a point not only in closing with a number of the witnesses, well, you know, there is no history of prior violence between these people. That must mean he couldn't possibly have done that. You recall what happened a year ago today? Remember the names Eric Harris and Dillon Klebold?"
Noser's trial counsel objected. The trial court sustained the objection saying: "Inappropriate, not evidence in this case."
Noser says that the prosecutor directed "inappropriate slurs" towards him by making statements to the effect that he was not the type of man who would be very attractive to women. The prosecutor said:
 "Think he's the type to sit and think oh well, there are plenty of other fish in the sea? I don't mean to be offensive, but this isn't Brad Pitt sitting here. This may have been the only woman he's ever loved."
When Noser's trial counsel objected, the prosecutor kept making statements to the effect that the victim may have been the only woman who ever showed any affection toward Noser. The trial court sustained the objections of Noser's trial counsel and directed counsel to approach the bench. After the conference at the bench, the prosecutor went on to another line of argument.
Noser says the prosecutor next tried to persuade the jury to find Noser guilty, not on the basis of the evidence in the case, but because a verdict of not guilty would "countenance murder". The prosecutor said: "If you say not guilty, then one of the things you're saying is hey, you can get away with murder." Again, the record shows that Noser's trial counsel objected, and the court sustained the objection.
The final statement that Noser argues constitutes prosecutorial misconduct, and which he says made a mistrial a necessity was:
 "Now, these 2 earrings are about all that's left of Brenda from that day, and he pitched them into a fire in Middletown, Ohio. Now, wherever Brenda is, it's time to let her rest in peace and to convict the man responsible."
Noser says this argument was a victim impact argument that was designed to move the jury's passion and sympathies. He says that the cumulative effect of all the statements above quoted resulted in his being denied a fair trial, even though the trial court sustained objections to the statements and made curative instructions.
While we agree with Noser that the above-quoted remarks were beyond the scope of proper argument, we do not agree that he was denied a fair trial or was entitled to a mistrial as a result of the remarks. First, we note that the trial court sustained objections and gave curative instructions for the improper remarks as they were made. Second, we find, after looking at the case as a whole, that it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty. Accordingly, Noser's fourth and fifth assignments of error are not well-taken and are denied.
In support of his supplemental assignment of error, Noser argues that the trial court committed reversible error when it permitted the jurors to ask questions of the witnesses. He reviews the procedure followed by the trial court in this case to permit juror questions.
At the outset of Noser's trial, the trial court outlined the following process. After the prosecutor and defense counsel had finished questioning a witness, each juror was directed to submit a piece of paper to the court on which each juror was directed to write either questions they wanted the court to ask of the witness who just testified or a statement to the effect that they had no questions. The jurors were told to fold their papers closed so no one else could see what they had written. The questions were then reviewed by the court, and the prosecutor and defense counsel were given the opportunity to object to the questions out of the hearing of the jury. The trial court then read the questions that had been ruled in conformance with the Ohio Rules of Evidence. Both the prosecutor and Noser's trial counsel were then given an opportunity to ask follow-up questions.
Noser says that this process was inherently prejudicial because: 1) the jurors were no longer neutral factfinders, instead they assumed the role of advocates; 2) the questions posed undermined the job done by the attorneys as advocates; 3) permitting jurors to ask questions of witnesses violates the right of a defendant to due process and a fair trial. He contends that truth seeking is not the most important interest in our justice system. He says that the function of seeking truth gives way to other interests, such as not admitting hearsay.Noser cites to a case recently decided by the First District Court of Appeals in Ohio,State v. Gilden (June 15, 2001), Hamilton App. No. C-000276, unreported, to support all of his contentions that the practice of jurors asking questions of witnesses during trial is so inherently prejudicial that he is entitled to a reversal of his conviction and a new trial.
Noser is correct that the First District Court of Appeals did rule that permitting jurors to ask questions of witnesses during trial, even with safeguards like those employed by the trial court in this case, is so inherently prejudicial a defendant need not show any actual prejudice and is entitled to a reversal of a conviction and a new trial. Id. However, the First District Court of Appeals also acknowledged that the Supreme Court of Ohio has not made any direct ruling on this issue, and that other appellate courts in Ohio, while urging caution to ensure no prejudice caused by the practice, have held that a trial court has discretion to permit jurors to ask questions. Id.
Indeed, our own research of this issue shows that Ohio courts have consistently ruled that a trial court has discretion to permit jurors to pose questions to be asked of witnesses during trial. See, e.g., Statev. Sheppard (1955), 100 Ohio App. 345, 390; State v. Mascarella (June 30, 1995), Tuscarawas App. No. 93 AP 100075, unreported; and State v.Ernst (Oct. 29, 1982), Sandusky App. No. S-82-7, unreported. While the practice of permitting jurors to directly ask questions of witnesses, forcing trial counsel to object to an improper question in front of the juror or to refrain from objecting in an effort to avoid antagonizing a juror has been found "fraught with danger" for creating prejudice, seeState v. Mascarella (June 30, 1995), Tuscarawas App. No. 93 AP 100075, Ohio appellate courts have recognized that with proper safeguards in place, the practice of permitting jurors to submit questions is not inherently prejudicial. See, State v. Sheppard (1955), 100 Ohio App. 345,390; State v. Mascarella (June 30, 1995), Tuscarawas App. No. 93 AP 100075, unreported; and State v. Ernst (Oct. 29, 1982), Sandusky App. No. S-82-7, unreported. Indeed, this court ruled that a trial court erred when it forbade juror questions in a preliminary instruction to the juror. State v. Ernst (Oct. 29, 1982), Sandusky App. No. S-82-7, unreported. In dicta, this court said:
 "[P]otential errors can be removed by careful screening of the question by the court, with the assistance of counsel.
 "The better procedure is that suggested in 4 Ohio Jury Instructions, Section 402.53:
 "`When a juror suggests a question or asks if he may put a question to a witness, the court may point out that questions must conform to the rules of evidence and that interrogation is a function of counsel. The answer to such a question should be delayed until both lawyers have completed their examination of the witness. Caution is required to avoid any inference that may be prejudicial to a party, unfair to a witness or embarrassing to counsel. However, jurors seldom ask idle questions. A conference with counsel will usually provide a method to supply the information, if it is admissible. If the question has not been stated, it is a safe practice to require the juror to submit it in writing to the court.'
 "Thus, it is error for a court to foreclose the jury from asking any questions. However, once a question is tendered by a juror, it is within the sound discretion of the court to determine whether or not that question should be propounded to the witness. If a question is to be tendered by a juror, it is within the sound discretion of the court to determine whether or not that question should be propounded to the witness. If a question is to be tendered by a juror, it should be done outside the presence of the other jurors, either orally or in writing. The court should then, with the assistance of counsel, determine whether the question is relevant, probative, conforms to the rules of evidence, and what, if any, prejudicial effect it may have upon either party, before the question is rejected or propounded to the witness." Id.
We remain persuaded that, given the proper controls and guidelines, a trial court does not abuse its discretion when it permits juror questions to be asked of witnesses. We disagree with the view expressed by the First District Court of Appeals of Ohio that the practice of permitting juror questions to be posed, even with proper guidelines and control, is so inherently prejudicial that no showing of actual prejudice is required to support the reversal of a conviction obtained in a trial where juror questions were posed. We also disagree with Noser's contention that the primary interest of our justice system is not a search for truth. The preeminent purpose of trial remains a search for relevant, probative, reliable truth. The evidentiary rules are designed to ensure that the only truth considered is truth that fits the above three guidelines.
Finally, we are persuaded that the practice of permitting juror questions under the guidelines followed by the trial court in this case poses no more danger that the jurors will abandon their neutral factfinding position than exists when a trial judge asks questions of a witness in a trial to the bench. In both instances, the factfinder (either the jury in a jury trial or the judge in a trial to the bench) poses questions of witnesses that are permitted by evidentiary rules and that help clarify information the factfinder has already heard through the testimony of the witness. Trial strategy of counsel is no more at risk from a properly approved and presented juror question than it is from a question posed by a trial judge from the bench. Accordingly, we find Noser's supplemental assignment of error not well-taken.
The judgment of the Lucas County Court of Common Pleas is affirmed. Noser is ordered to pay the court costs of this appeal.
Because our decision in this case is in conflict with the judgment of the First District Court of Appeals of Ohio in State v. Gilden (June 30, 2001), Tuscarawas App. No. 93 AP 100075, unreported, on the issue of whether it is inherently prejudicial error to permit juror questions to be posed to witnesses when the following guidelines are followed: a) all jurors are directed to submit written statements on folded paper to the court following the full examination of a witness by the prosecution and defense, either indicating the juror has no question or presenting the question(s) in the juror's mind; b) the questions are reviewed by the prosecution and defense and the trial court rules on objections to questions out of the hearing of the jury; c) the trial court reads only the questions that meet evidentiary rule guidelines; and d) both the prosecution and the defense are permitted to ask follow-up questions of the witnesses, we certify the record of this case to the Supreme Court of Ohio for review and final determination on that issue. The parties are directed to S.Ct.Prac.R. IV for guidance.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Mark L. Pietrykowski, P.J. concurs, and Richard W. Knepper, J. concurs in judgment only.