OPINION
{¶ 1} Defendant-appellant Desmond Rorie appeals from his conviction and sentence in the Stark County Court of Common Pleas on one count of felonious assault. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant was indicted on one count of felonious assault, in violation of R.C. 2903.11(A)(1). The case proceeded to a jury trial. The following facts were elicited at trial.
 {¶ 3} Tina Rorie and Desmond Rorie [hereinafter appellant] were married for two years and have a daughter, Haley. Haley was two years old at the time of the trial. The Rories lived together but were having problems in their marriage. The Rorie's home was across the street from the home of Tina's parents.
 {¶ 4} On November 30, 2001, Tina arrived home from work around 11:30 p.m. Appellant was home and was getting ready to go out for the evening. Tina asked him to stay home but appellant stated that he wanted to leave and would be gone for two hours. After appellant left, Tina took a bath and went to bed, with Haley sleeping in the bed beside her. Around 2:30 A.M., Tina awoke to the sound of a car door shutting. According to Tina, appellant entered the house and came into the bedroom. Appellant stated he wanted to ask Tina a question; namely, whether she worked with anyone named Jason. Tina told appellant no, and that she did not know anyone named Jason. According to Tina, at that point, appellant grabbed her and started choking her. Tina testified that Haley was still in the bedroom and cried out "Daddy, please stop." Haley then ran to her own room.
 {¶ 5} According to Tina's testimony, when appellant eventually let her go, she said yes, she did work with someone named Jason but she had only spoken to Jason in passing. According to Tina, appellant refused to believe her and kept asking whether she was "f'ing [sic] him at work." Transcript of Proceedings, Vol. II, pg. 28. Tina testified that appellant repeatedly grabbed her by her neck or hair and choked her. Tina claimed that in response, she tried to calm appellant down, reassuring him that she was not sleeping with anyone and that she loved him and no one else. According to Tina, during the assault, she held Haley against herself at one point, hoping the sight of his daughter would help appellant stop the assault. However, appellant told her to put the baby down and count to ten. Tina then told Haley to stay in her room.
 {¶ 6} Tina claimed that she tried to get away by running down the steps, but appellant chased her. She was able to turn the deadbolt on the front door but appellant grabbed her. Tina bit him. Appellant then bit Tina back on her cheek, arm and back and told Tina to go back upstairs. Tina testified that at this point, she realized that her nose was bleeding. She went into the bathroom to look into the mirror. There she saw that her nose was cut. Tina claimed that she then called out to Haley to let her know that she was okay. She did not hear Haley respond.
 {¶ 7} Tina testified that she continued to try to reassure appellant and calm him down. However, according to Tina, appellant would not believe that she was not having an affair. Tina then told appellant to call his mother, hoping that his mother would help him see reason. Appellant instead handed the phone to Tina, insisting that she call Jason. Tina stated that as she stood in the bathroom, appellant started punching her in the ribs, "hitting her like she was a man." One punch knocked the wind out of her and she fell to the floor.
 {¶ 8} Tina testified that appellant then proceeded to kick her repeatedly. Tina stated that she became lightheaded and remembered appellant asking her again and again who she was sleeping with. The next thing she recalled was waking up in the hallway.
 {¶ 9} When she woke up, appellant was no longer assaulting her. Instead, she smelled cleaning fluid and heard water running in the bathtub. Tina testified that she saw appellant with bathroom cleanser and a towel in his hand. Appellant told Tina that she had blood all over herself and her clothing and told her to get into the bathtub. Tina testified that at this point, appellant seemed calm. He helped her to take her clothes off and get into the bathtub. In addition, appellant called out to Haley and picked the child up and took her downstairs.
 {¶ 10} Tina testified that when she heard appellant go downstairs, "reality hit her" and she realized that she needed to get out of the house immediately. Tina testified that she jumped out of the tub, and fearing to use the telephone because it would take too long, she ran down the stairs and out the front door, naked. She crossed the street to her parents' house and rang the doorbell.
 {¶ 11} Tina's mother, Mary Ellis, testified that she awoke to the ringing doorbell and ran to the door. She heard her daughter hollering "open the door mom. Open the door. Please open the door." Transcript of Proceedings, Vol. II, pg. 89. Mrs. Ellis let Tina in and Tina told her to lock the door and to hurry because Desmond was after her. Id.
 {¶ 12} Mrs. Ellis stated that she was frightened by the appearance of her daughter because she was virtually unrecognizable. Tina was covered in bruises and crawled up three short steps into her mother's dining room while repeating her pleas to lock the door. Tina then asked her mother to call 9-1-1 because she could not breathe. In addition, Tina asked what time it was and Mrs. Ellis replied that it was 20 till 5:00. Tina told her mother that Desmond had been beating her since 2:30 A.M.
 {¶ 13} Firefighter-paramedic Bennett was among the first emergency personnel to arrive at Tina's parent's house. He observed Tina slumped in a chair, naked except for a robe. Bennett observed that Tina looked frightened and upset and appeared to have been beaten very badly. She was bleeding from her nose and lip, and her eyes were almost completely swollen shut. Tina was transported by ambulance to a hospital.
 {¶ 14} Dr. Jody Wozniak, an emergency room physician, performed a head to toe examine of Tina. Tina's face was bruised and her upper lip was cut open all the way through, requiring stitching in multiple layers. Tina had bleeding in both eyes, meaning that the blood vessels underneath the eyes had broken. The white parts of her eyes were red and the areas around her eyes were bruised. Her nose was cut across the top and bleeding. Dr. Wozniak observed finger marks and bruising around Tina's neck, consistent with strangulation. Tina was covered in bruises around her midabdomen and into her crotch. In fact, the imprint of a foot was still visible upon her chest. Tina was crying and upset throughout the exam. Ultimately Dr. Wozniak noted that Tina had suffered fractured ribs, a small collapse of her left lung, a broken nose and a broken finger. In addition, Tina had severe bruising and contusions all over her body and the complicated laceration of her upper lip.
 {¶ 15} In the meantime, the Canton Police Department investigated the assault. Officer David Samuels was one of the first officers on the scene. He spoke with Tina at her parent's house and asked her who assaulted her. Tina responded "Desmond." Tina's mother advised the officer that Desmond was Tina's husband and that their two year old daughter, Haley, was still in the house. Officer Samuels went to Tina's residence to look for appellant and Haley. Additional officers arrived. Officer James Nixon approached the front door of Tina's residence and heard a child on the other side screaming "no daddy, no" and heard a thud against the door. After a few minutes the child's screams stopped. Afraid that the child was being used as a shield, the police requested that a supervisor come to the house to advise on further action.
 {¶ 16} A sergeant arrived and attempted, by telephone, to contact appellant, who they believed to be inside the home. The police could hear the telephone ringing inside, but there was no answer. Finally, the sergeant entered the house through the open front door. The police located Haley inside the house and took her to her grandmother.
 {¶ 17} The Canton Police Department collected evidence from Tina's residence, including wet stained clothing, a bloody towel and washcloth, and a bottle of bathroom cleanser. Mary Ellis later described the inside of her daughter's house after the assault as being in an unrecognizable state of disarray.
 {¶ 18} Tina and her family did not see appellant in the aftermath of the beating. Appellant did not come to the hospital where Tina was required to stay for three or four nights and made no attempt to see his daughter. Tina and Haley stayed with Tina's parents after she was released from the hospital.
 {¶ 19} The Canton Police did not find appellant either and issued a warrant for his arrest for felonious assault. However, on March 17, 2002, Officer Miller of the White Hall Police Department encountered appellant near Columbus, Ohio. Appellant caught Officer Miller's attention around 12:30 A.M. when appellant was jaywalking between two gas stations and kept looking at the officer.
 {¶ 20} Officer Miller approached appellant and asked for identification. Appellant provided a false name and social security number. Officer Miller conducted a quick pat down for safety and was escorting appellant back to his cruiser when appellant took off running. Officer Miller chased appellant and a brief struggle ensued, during which Officer Miller had to subdue appellant with pepper spray.
 {¶ 21} Officer Miller transported appellant to the White Hall Police Department where appellant claimed to be Charles Snowden. Charles Snowden is appellant's brother. The police discovered the lie when they pulled a Bureau of Motor Vehicles photograph of the real Charles Snowden. Eventually, they identified appellant and discovered the existence of the warrant for felonious assault. Appellant told Officer Miller that he was basically hiding out in Columbus because of the warrant.
 {¶ 22} As appellant was being fingerprinted, Officer Miller and appellant had a conversation. Officer Miller asked appellant who was the victim of the assault. Appellant did not tell him. However, appellant did tell Officer Miller that he had discovered his wife was having an affair with a co-worker.
 {¶ 23} Officer Salyers, another White Hall police officer, transported appellant to the Franklin County Jail, along with three or four younger arrestees. En route to the jail, appellant lectured the prisoners about how to behave in jail and how to stay out of trouble. The other prisoners asked why appellant had been arrested and Officer Salyers told them that appellant had a warrant for felonious assault. Appellant commented that he wasn't worried because it was a "domestic thing" and the victim was going to drop the charges.
 {¶ 24} Jasmine Beasley was the only defense witness at trial. Beasley had three children, two of whom were fathered by appellant's brother, Charles Snowden. Beasley testified that in the early morning hours of November 30, 2001, she was with appellant. She claimed that she and appellant had "hooked up," falling asleep together around 5:00 A.M. and that she did not wake up until noon the next day. Beasley claimed that she remembered the entire incident, including the date, because she was in trouble with her babysitter when she finally arrived home. The babysitter happened to be appellant's and Snowden's sister. The babysitter asked Beasley who she was with the night before, but Beasley did not tell her.
 {¶ 25} Beasley further claimed that even though she had heard Tina had been beaten up by appellant that night, she did not come forward with her account because she wanted Snowdon to continue to be a father to their children. She testified that when the story of her night with appellant did come out, Snowdon beat her up four times, although she only reported it to the police once. Beasley claimed that she had everything to lose and that now the entire family was mad at her because she slept with appellant.
 {¶ 26} Upon deliberation, the jury returned a verdict of guilty. Subsequently, appellant was sentenced to a prison term of eight years.
 {¶ 27} On August 6, 2002, appellant filed a timely appeal. However, after transmission of the record, appellant's appellate counsel failed to file a merit brief. As a result, the appeal was dismissed for want of prosecution.
 {¶ 28} Subsequently, on June 16, 2004, appellant filed a motion to reopen his appeal. On July 28, 2004, this Court granted appellant's motion. New appellate counsel was appointed and the appeal proceeded.
 {¶ 29} Thus, upon the reopening of his appeal, appellant raises the following assignments of error:
 {¶ 30} "I. The trial court erred when it admitted into evidence Mr. Rorie's custodial statements to the police, which were obtained without any explanation of rights, as required by Miranda v. Arizona (1996),384 U.S. 436, and its progeny, in contravention of the fifth andfourteenth amendments to the United States Constitution, and Section 10, Article 1, of the ohio constitution.
 {¶ 31} "II. The trial court erred when it permitted the state to introduce into evidence hearsay statements of an incompetent child witness, in contravention of mr. rorie's right to confrontation, as guaranteed by the sixth and the fourteenth amendments to the United States Constitution and Section 10, Article I of the ohio constitution.
 {¶ 32} "III. The trial court erred when it imposed a maximum term of incarceration based on facts that were neither found by the jury nor admitted by Mr. Rorie, in contravention of Mr. Rorie's sixth amendment right to trial by jury.
 {¶ 33} "IV. Trial counsel's failure to challenge the admissibility of mr. rorie's unconstitutionally obtained custodial statements to the police made in response to interrogation constituted ineffective assistance of counsel.
 {¶ 34} "V. Mr. Rorie was deprived of his right to effective assistance of appellate counsel, in contravention of the fourteenth amendment to the United States Constitution and Section 16, Article I of the ohio costitution."
 I {¶ 35} In the first assignment of error, appellant contends that the trial court erred when it admitted into evidence statements which appellant made to police when appellant had not been advised of his rights, pursuant to Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.694 and its progeny. Upon review, we find no grounds for reversal.
 {¶ 36} In Miranda, the United States Supreme Court held that theFifth Amendment to the United States Constitution prevents the admission at trial of statements made by a defendant during custodial interrogation when the defendant has not been advised of certain rights. A "custodial interrogation" is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. Miranda v.Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The determination as to whether a custodial interrogation has occurred, requiring Miranda warnings, requires an inquiry into how a reasonable person in the suspect's position would have understood the situation, and the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest. State v. Biros, 78 Ohio St.3d 426, 440, 1997-Ohio-204,678 N.E.2d 891. For Miranda purposes, interrogation has been defined as "not only express questioning, but also any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police know are reasonably likely to elicit an incriminating response from the suspect." An "incriminating response" is any response, whether inculpatory or exculpatory, that the prosecution may seek to introduce at trial. Id. at fn. 5. Rhode Island v. Innis (1980),446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L.Ed2d 297. Routine questions which arise in situations such as during the booking process do not constitute interrogation.
 {¶ 37} Appellant challenges the testimony given by Officer Miller. However, appellant's counsel failed to file a motion to suppress the statements and failed to object to the testimony. Therefore, we review this assignment of error under a plain error analysis, pursuant to Crim.R. 52(B). This rule provides, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. See State v. Long (1978),53 Ohio St.2d 91, 372 N.E.2d 804; State v. Cooperrider (1983),4 Ohio St.3d 226, 448 N.E.2d 452. An alleged error does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. State v. Stojetz, 84 Ohio St.3d 452, 455,1999-Ohio-464, 705 N.E.2d 329.
 {¶ 38} Appellant challenges the following testimony:
 {¶ 39} "A. [Officer Miller] He stated that he — when I brought him out to process him, he stated that he was down in Columbus hiding out basically because he had a warrant.
 {¶ 40} "Q. [Assistant Prosecutor] And did you verify that he did have a warrant?
 {¶ 41} "A. Yes.
 {¶ 42} "Q. And then what happened?
 {¶ 43} "A. When fingerprinting him I asked him several questions about who he had assaulted. I learned it was for felonious assault. He didn't specifically say who he assaulted. He did state that he found out through a friend his wife was having an affair with a coworker.
 {¶ 44} "Q. Did he say anything else?
 {¶ 45} "A. He went on with a story or related a story to me, but it at the time didn't seem relevant to anything in particular." Transcript of Proceedings, Vol. III, pg. 36.
 {¶ 46} As stated above, our standard of review is plain error. Thus, in order to reverse, this court must find that but for the error, the outcome of the trial would have been different. Upon review, we find that, even if the testimony was admitted in error, it was not plain error. We cannot say that but for this evidence, appellant would not have been convicted. Tina testified in detail about the assault. She clearly and repeatedly implicated appellant as the assailant. The victim's injuries left no doubt as to whether an assault occurred and the victim, from the time she escaped to her parents' home, until trial, named appellant as the assailant. Based upon this very strong evidence, we find no plain error.
 {¶ 47} Accordingly, appellant's first assignment of error is overruled.
 II {¶ 48} In the second assignment of error, appellant argues that the trial court erred when it permitted the State to introduce into evidence hearsay statements of an incompetent child witness. We disagree.
 {¶ 49} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus. Therefore, we will not disturb a trial court's evidentiary ruling unless we find the ruling to be an abuse of discretion. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140.
 {¶ 50} Appellant challenges two instances in which a witness was permitted to testify as to what was said by Haley, who was one and a half years old at the time of the assault. Generally, children are competent to testify unless they are under the age of ten and appear to be incapable of "receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Evid. R. 601(A). Haley was well under the age of 10. Thus, appellant argues that because of the child's age, she was presumed to be incompetent to testify. Appellant then cites to State v. Said, 71 Ohio St.3d 473,1994-Ohio-402, 644 N.E.2d 337 for the proposition that before hearsay statements[1] of a child can be admitted at trial, a trial court must determine whether the child is competent to testify. Appellant points out that the trial court never conducted any hearing or questioning to determine whether Haley could accurately perceive and intelligibly communicate impressions of fact. Appellant argues that without such a determination that the child was competent to testify, the child's hearsay statements should never have been admitted into evidence.
 {¶ 51} We will address each instance of challenged testimony individually.
 {¶ 52} The first challenge arose when Tina was testifying as to what happened during the assault. Tina testified as follows:
 {¶ 53} "Q. [Assistant Prosecutor]: And then what happened?
 {¶ 54} "A. [Tina Rorie]: Then he grabbed me and started choking me.
 {¶ 55} "Q. Was Haley awake?
 {¶ 56} "A. Yes.
 {¶ 57} "Q. What was Haley doing?
 {¶ 58} "A. She asked, please, Daddy, stop.
 {¶ 59} "Q. MR. LODICO: I object.
 {¶ 60} "THE COURT: Overruled. Go ahead.
 {¶ 61} "Q. And then what happened?
 {¶ 62} "A. Haley ran to her bedroom." Transcript of Proceedings, Vol. II, pg. 27.
(Emphasis added.)
 {¶ 63} We find Tina's trial testimony that Haley said, "please, Daddy, stop", does constitute hearsay. Given the context of the preceding questions, it seems clear the impact of the statement is "please, Daddy, stop [choking Tina]". The statement corroborates Tina's testimony and tends to prove the truth of the matter asserted, i.e., appellant was choking Tina. Neither the fact that the question posed to the witness concerned something else (where the child was during the assault), nor the fact that the answer was an indirect answer to that question changes the nature of the answer given from hearsay to non-hearsay. The fact that the question was not intended to illicit hearsay and produce an indirect answer to the question does not change the underlying character of the answer. We conclude that the admission of this testimony over objection was error. However, as discussed below, its admission was harmless beyond a reasonable doubt.
 {¶ 64} In the second instance of challenged testimony, Officer Nixon testified that when he approached the front door of Tina Rorie's residence, he heard a child screaming "no, daddy," over and over again. Transcript of Proceedings, Vol. II, pg. 136-137. This statement was not presented to prove the truth of the matter asserted. By the time the officer approached the residence, Tina Rorie was already out of the house and the investigation was underway. This testimony was presented as the officer described how he approached the residence and his concerns about the child. These issues were not presented to prove that the child said "no" to her father or to prove that appellant was the perpetrator of an offense. Thus, the testimony was not hearsay.
 {¶ 65} One last issue must be addressed. In appellant's merit brief, he presents a conclusory assertion that the admission of the hearsay statements of Haley violated appellant's right to confront the witnesses against him, citing Crawford v. Washington (2004), 541 U.S. ___,124 S.Ct. 1354, 158 L.Ed.2d 177.
 {¶ 66} As noted above, this court has concluded that the challenged evidence first addressed above did constitute hearsay. However, we find the admission of this hearsay to be harmless beyond a reasonable doubt.[2] In determining whether a constitutional error is harmless, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Chapman v. California (1967),386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705;Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674
(holding that the harmless error analysis established in Chapman, supra, applies to confrontation clause violations). Upon review of the record and in light of the other evidence presented, we find there is no reasonable possibility that the challenged evidence contributed to the conviction. The child's statement was insignificant when compared to the other evidence presented and would not have impacted the outcome of the case. Therefore, admission of this statement is not grounds for reversal.
 {¶ 67} Accordingly, appellant's second assignment of error is overruled.
 III {¶ 68} In the third assignment of error, appellant contends that the trial court erred when it imposed a maximum sentence based upon facts that were neither found by the jury nor admitted by appellant. When the trial court sentenced appellant to the maximum sentence, the trial court made the findings required by R.C. 2929.14(C). However, appellant contends that pursuant to Blakely v. Washington (2004), 542 U.S. ___,124 S. Ct. 2531, 159 L.E.2d 403, in order to sentence appellant to more than the minimum sentence, the jury, not the trial court, had to make the requisite findings. We disagree.
 {¶ 69} This court has considered this issue previously. This court examined the Blakely decision and found it "do[es] not obviate entirely judicial discretion in sentencing a criminal defendant. Rather, the trial courts maintain discretion to select a sentence within the range prescribed by the legislature." State v. Iddings (November 8, 2004), Delaware App. No. 2004CAA06043. This Court concluded that Blakely was not implicated when the maximum sentence provided by Ohio sentencing law was imposed. Id; State v. Small, Delaware App. No. 2005-Ohio-169, State v.Stillman, Delaware App. No. 04CAA07052, 2004-Ohio-6974, State v.Hughett, Delaware App. No. 04CAA060051, 2004-Ohio-6207 (but see dissent by J. Hoffman).
 {¶ 70} Accordingly, appellant's third assignment of error is overruled.
 IV {¶ 71} In the fourth assignment of error, appellant contends that his trial counsel was ineffective when counsel failed to object to the admissibility of the statements made by appellant to police, as challenged in assignment of error I. We disagree.
 {¶ 72} The standard of review for a claim of ineffective counsel was established in Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674 and adopted by Ohio in State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373. These cases set forth a two-pronged analysis. The first prong of the analysis requires a showing that counsel's assistance was ineffective in that it fell below an objective standard of reasonable representation and violated essential duties to the client. The second prong requires a showing of actual prejudice by counsel's ineffectiveness such that but for the counsel's unprofessional error the outcome of the trial would have been different. This requires a showing there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court may dispose of a case by considering the second prong first, if that would facilitate disposal of the case. Bradley, 42 Ohio St.3d at 143, 538 N.E.2d 373 (citingStrickland, 466 U.S. at 697.) Further, we note that a properly licensed attorney is presumed competent. See Vaughn v. Maxwell (1965),2 Ohio St.2d 299, 209 N.E.2d 164; State v. Calhoun, 86 Ohio St.3d 279,1999-Ohio-102, 714 N.E.2d 905.
 {¶ 73} Upon review, we find that appellant has failed to establish prejudice. For the reasons discussed in assignment of error I, even if counsel had objected and the evidence concerning his statement to police had been stricken, there is no reasonable probability that the outcome of the trial would have been different. Thus, we find no prejudice.
 {¶ 74} Accordingly, appellant's fourth assignment of error is overruled.
 V {¶ 75} In the fifth and final assignment of error, appellant argues that his right to effective assistance of appellate counsel was denied when his first appellate counsel failed to file an appellate brief, despite requesting six extensions of time to file such a brief. This resulted in the initial appeal being dismissed for want of prosecution. Appellant's current appellate counsel argues that appellant is therefore entitled to a new appeal.
 {¶ 76} We find this argument to be meritless in light of the fact that this court granted appellant's motion to re-open his appeal. Thus, appellant has been granted the opportunity to pursue an appeal, with new appellate counsel. See App. R. 26(B)(7).[3] In addition, the trial court's decision has been affirmed. Therefore, appellant has not been prejudiced by the delay in pursuing his appeal.
 {¶ 77} Appellant's fifth and final assignment of error is overruled.
 {¶ 78} The judgment of the Stark County Court of Common Pleas is affirmed.
Edwards, J. Wise, J. concurs and Hoffman, P.J. concurs in part and dissents in part.
Hoffman, P.J., concurring in part and dissenting in part.
 {¶ 79} I concur in the majority's analysis and disposition of appellant's first, second, fourth, and fifth assignments of error.
 {¶ 80} For the reasons set forth in my dissent in State v. Hughett,
Delaware App. No. 04CAA060051, I respectfully dissent from the majority's disposition of appellant's third assignment of error. See, also, Statev. Lowery, Hamilton App. No. C-040157, 2005-Ohio-1181.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C).
[2] We note that even if the evidence challenged in the second instance were hearsay, its admission was harmless beyond a reasonable doubt also.
[3] "If the application [to reopen an appeal] is granted, the case shall proceed as on an initial appeal in accordance with these rules except that the court may limit its review to those assignments of error and arguments not previously considered." App. R. 26(B)(7).