OPINION
{¶ 1} Appellant, Joseph Bailey, was convicted of felonious assault in violation of R.C. 2903.11(A)(1) following his jury trial in the Jefferson County Court of Common Pleas. He was sentenced to eight years in prison without an opportunity for early release and five years of post release control. (June 15, 2006, Judgment Entry of Sentence.)
 {¶ 2} The jury unanimously concluded that Appellant inflicted permanent disabling injuries to his live-in girlfriend's fourteen-month-old daughter. The testimony revealed that Appellant had beaten and shaken the child, causing permanent brain damage that required removal of approximately 20% of her brain, permanent paralysis, and blindness in one eye. Appellant testified that the child's injuries occurred when he accidentally fell on top of the girl.
 {¶ 3} Appellant raises four assignments of error on appeal. He argues that he was denied a fair trial based on the amount of pre-trial publicity; the document indicting him was defective; the jury's verdict was against the manifest weight of the evidence; and that his maximum sentence is contrary to the sentencing guidelines. For the following reasons, Appellant's claimed errors lack merit and are overruled.
 {¶ 4} In Appellant's first assignment of error he claims:
 {¶ 5} "THE DEFENDANT WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL TRIAL BY A JURY OF HIS PEERS ABSENT A CHANGE OF VENUE BECAUSE OF THE EXTREME AMOUNT OF PRE-TRIAL PUBLICITY RENDERED THE ENTIRE JURY POOL POLLUTED BEYOND A POINT WHERE VOIR DIRE WAS ABLE TO CORRECT." *Page 2 
 {¶ 6} A trial court generally has discretion to grant or deny a motion for a change of venue and its ruling will not be disturbed on appeal unless the ruling rises to the level of an abuse of discretion.State v. Lundgren (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304. Crim.R. 18(B) provides for a change of venue, "[u]pon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending."
 {¶ 7} A defendant claiming his or her right to a fair trial was denied based on pretrial publicity must usually show that a juror was actually biased. State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126,767 N.E.2d 216, at ¶ 86. However, "`[p]rejudice is presumed * * * when pretrial publicity is sufficiently prejudicial and inflammatory and * * * saturated the community where the trials were held.'" (Citations omitted.) Id.
 {¶ 8} In the instant case, Appellant did not file a motion for a change of venue. Thus, we can only review this argument for plain error pursuant to Crim.R. 52(B). To prevail under the plain error doctrine, a defendant must demonstrate that, but for the error, the outcome of trial clearly would have been different. State v. Stojetz (1999),84 Ohio St.3d 452, 455, 705 N.E.2d 329, citing State v. Long (1978),53 Ohio St.2d 91, 372 N.E.2d 804. Notice of plain error, "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at 97. *Page 3 
 {¶ 9} Because Appellant did not file a motion for change of venue, there is no real evidence as to the amount or extent of the alleged pretrial publicity. A review of the record in the instant matter reveals, however, that the issue of pre-trial publicity in general arose during voir dire. The prosecution asked the potential jurors if any of them had, prior to that day, heard or received any information about Appellant's case. Only one person in the first group of potential jurors responded, indicating that he knew the victim's aunt and was aware of the allegations in this case. This potential juror stated, however, that he could, "keep an open mind and be fair and impartial in this case[.]" (Tr., pp. 12-13, 24.) Nevertheless, Appellant's counsel exercised a preemptory challenge and the potential juror was excused. (Tr., p. 40.)
 {¶ 10} Later in the voir dire proceedings, another potential juror also indicated that he remembered hearing some information about this case when it first occurred. However, he indicated that he would be able to serve and abide by the presumption of innocence. (Tr., p. 44.)
 {¶ 11} Appellant's counsel also addressed the issue of pre-trial publicity during voir dire. He asked the potential jurors whether they had seen anything on television about this case. One juror responded that the name sounded familiar, but that she was not sure if the case at bar was the one she vaguely associated with the name. Regardless, she indicated that the news reports would not affect her opinion. At that point, the rest of the potential jurors were also asked whether television and radio reports would influence their opinions. They all indicated that the media coverage would not influence their impartiality. (Tr., pp. 21-22.) *Page 4 
 {¶ 12} Four additional potential jurors and an alternate indicated that they had heard something about this case on the news. One also worked as a nurse with the state's witness Dr. Roig. (Tr., pp. 33-34.) Each of these, however, indicated that they had no preconceptions and would be fair and impartial. (Tr., pp. 33-34, 55-58, 71-73.)
 {¶ 13} Only one person in the jury pool responded negatively when confronted with this issue. This woman indicated that she had heard about the case on the news and that it, "made my heart sick." She said she was unable to be impartial, and she was excused for cause. (Tr., pp. 69-70.)
 {¶ 14} Based on the foregoing, we are unable to find plain error. All of the jurors impaneled who were aware in some way of the media coverage in this case indicated that they could proceed impartially. Appellant raises no other evidence of record to show actual prejudice on the part of any juror. As such, we cannot find bias or prejudice. This assignment of error lacks merit and is overruled.
 {¶ 15} It should be noted here that Appellant alleges a current internet search reveals approximately fourteen current and archived stories relating to his case. However, the extent of the media coverage or number of internet news stories regarding this case is not in the trial court's record and is therefore not reviewable on appeal.State v. Ishmail (1978), 54 Ohio St.2d 402, 377 N.E.2d 500, paragraph one of the syllabus. Further, this assertion does not help Appellant show actual bias or prejudice on the part of any juror and, as such, is irrelevant to this issue.
 {¶ 16} Appellant's second assignment of error states: *Page 5 
 {¶ 17} "THE INDICTMENT RETURNED ON OCTOBER 15, 2005 IS DEFECTIVE ON IT'S [SIC] FACE BECAUSE IT RESTRICTS THE DATE OF THE ACCUSED CRIMINAL ACTIVITY TO AUGUST 13, 2005 WHEN THE STATE'S CASE IN CHIEF AND REBUTTAL WITNESSES TESTIFIED TO A CONTINUING PATTERN OF CRIMINAL ACTIVITY BEYOND THE LETTER OF THE INDICTMENT."
 {¶ 18} Appellant argues that his indictment was void and his conviction must be vacated based on the fact that the indicting document limited the date of his criminal offense to August 13, 2005. Appellant alleges that the state's primary medical expert testified that the victim's brain injuries were acute, explaining that the brain injuries were, "new and weeks old." (Tr., p. 274.) Appellant claims that since the victim's serious physical injuries were both newly acquired and weeks old, the state was unable to establish that the harm occurred on or about August 13, 2005.
 {¶ 19} As Appellant contends, Dr. Berger stated at one point during her lengthy testimony that the victim had both newly acquired brain injury and evidence of other brain injury that appeared to have been incurred over the course of some weeks. Nonetheless, her statement that some brain injuries appeared weeks old did not eliminate her clear testimony that many injuries were also new. Appellant's counsel never cross-examined Dr. Berger on this issue, and there was never an inquiry as to whether the older injuries to the victim's brain were more extensive or somehow minimized the more recent brain injuries inflicted by Appellant on or about August 13, 2005. *Page 6 
 {¶ 20} Appellant directs our attention to the rebuttal testimony of the victim's cousin apparently to support this argument. The boy was called to rebut Appellant's testimony that he never struck or abused the victim. The cousin testified that he witnessed Appellant shake the child during the six-month period while Appellant was dating his aunt, the victim's mother. (Tr., pp. 419-420.) The cousin was not present on the night in question.
 {¶ 21} Appellant alleges the state intentionally elicited this testimony about alleged prior acts to support Dr. Berger's statement that some of the victim's brain injuries were not recently inflicted. Appellant believes this somehow buttresses his claim that the date in the indictment was faulty; that the state was impermissibly "coat-tailing" testimony of prior bad acts to show a pattern of bad behavior because they cannot show the injury which lead to conviction occurred on the night named in the indictment. Appellant believes that this testimony really shows that the injury did not actually or solely occur on August 13, 2005. Thus, Appellant claims we must void his indictment and conviction. However, a review of the trial transcript reveals that Appellant is incorrect in this assertion.
 {¶ 22} Appellant did not raise this claimed error to the trial court. His failure to object to the indictment before or during trial waived this issue on appeal. Crim.R. 12(C)(2) and 12(H); State v. Mills (1992),62 Ohio St.3d 357, 363, 582 N.E.2d 972. The Supreme Court inMills stated,
 {¶ 23} "Under Crim.R. 7(B), an indictment may be made in ordinary and concise language, including statutory language, and the indictment is sufficient if it *Page 7 
gives the defendant notice of all elements of the charged offense. * * * Under Crim.R. 12(B) and 12[(H)], alleged defects in an indictment must be asserted before trial or they are waived." Id. at 363.
 {¶ 24} An examination of the record clearly shows that, while Dr. Berger did testify that the child presented with evidence of old brain injury, on the date in question the child showed evidence of new injury, injury that ultimately proved to be permanent and serious. It is undisputed that Appellant was alerted in the indictment of all the elements of his offense. Clearly the indictment uses the language "on or about" the date in question. Appellant merely now appears to argue, for the first time, that the date listed in the indictment may not be the only date on which the child was harmed. If Appellant believed he was erroneously indicted, he certainly failed to raise it to the trial court at any time and may not do so, now. We cannot discern any error in either the indictment or in the subsequent evidence going to the charges in that indictment.
 {¶ 25} Based on the foregoing, Appellant's second assignment of error lacks merit and is overruled.
 {¶ 26} Appellant's third assignment of error alleges:
 {¶ 27} "THE JURY'S VERDICT IN THE DEFENDANT-APPELLANT JOSEPH BAILEY'S CONVICTION OF FELONIOUS ASSAULT CONTRARY TO O.R.C. § 2903.11 (A)(1) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT TRIAL." *Page 8 
 {¶ 28} Appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which prohibits a defendant from knowingly causing serious physical harm to another. "Serious physical harm to persons" is defined in 2901.01(A)(5) as,
 {¶ 29} "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 {¶ 30} "(b) Any physical harm that carries a substantial risk of death;
 {¶ 31} "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 {¶ 32} "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 {¶ 33} "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."
 {¶ 34} In considering a manifest weight of the evidence argument, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. *Page 9 
 {¶ 35} Further, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required to reverse a jury's verdict on weight of the evidence grounds. Thompkins, paragraph four of the syllabus.
 {¶ 36} Appellant alleges that the evidence failed to establish that he knowingly caused serious physical harm to the victim. R.C. 2901.22(B) provides, "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 37} Contrary to Appellant's arguments, the record contains more than enough evidence that he knowingly caused serious physical harm to the victim, who was fourteen months old at the time.
 {¶ 38} Appellant testified that on the night of August 13, 2005, he came home to the residence that he shared with Theresa Bunting and two of her children in Wintersville, Ohio. Theresa was working that night, so Appellant checked on the fourteen-month old.
 {¶ 39} Appellant alleged that the toddler was suffering from diarrhea. Thus, he removed her diaper and took her to the bathroom to clean her. Appellant claims that he did not turn on the hallway light, and upon entering the bathroom, he tripped on a stroller that was in the doorway. Appellant claims that the child's head struck the door frame and that they both then fell onto the floor. Appellant says he fell on top of the girl, and his collar bone struck her in the temple. (Tr., pp. 309-313.) *Page 10 
 {¶ 40} Appellant claims that afterward, he consoled the child and that she appeared fine when he eventually put her to bed. He called Theresa at work to alert her to their fall. He says he checked on the girl sometime later and noticed that she had rolled over and vomited. He again checked on her when Theresa arrived home from work, and the toddler appeared fine. The next morning at about 6 a.m., Appellant checked on her and she had a high fever. Appellant woke Theresa and they rushed the child to the emergency room at Trinity West in Steubenville, Ohio. (Tr., pp. 315-319.)
 {¶ 41} Appellant denied ever physically disciplining Theresa's children, and he denied ever striking or hitting Theresa or the children. (Tr., pp. 303-304.)
 {¶ 42} Upon arriving at Trinity West, Appellant was carrying the toddler who looked like a "rag doll, limp, placid[.]" (Tr., p. 158.) Dr. Roig, the emergency room physician, testified that when Appellant gave the child's initial medical symptoms he said she had diarrhea, vomiting, high fever, and was difficult to arouse. Dr. Roig described the child as "[v]ery traumatized," and after ventilating her, Dr. Roig stated that it was easy to see that she had suffered a very significant head injury. (Tr. p. 158.) She had bruises on both sides of her head, her cheek, and odd bruises on her chest that looked like "thumb print bruises." She also had bruising on both sides of her perineal or vaginal and anus areas. (Tr., pp. 157, 158, 159, 163-165.)
 {¶ 43} Dr. Roig also noted that the girl had "brown pupil," which is indicative of a subdural hematoma. Upon feeling her head, Dr. Roig could feel that her skull was disjointed or fractured. The fracture was significant; it felt like, "pieces of concrete *Page 11 
were laying off of each other." (Tr., p. 166.) At the time of presentment to Dr. Roig, the child was taking three to five breaths per minute whereas a healthy child of her age takes 25 to 35 breaths per minute. (Tr., pp. 165, 168.)
 {¶ 44} When Dr. Roig pressed Appellant further as to how the toddler received these injuries, Appellant shrugged his shoulders. Only then did Appellant reveal this story that he fell on top of her the night before. (Tr., pp. 169-170.) Dr. Roig's three diagnoses of the child included pulmonary arrest, clinical subdural hemorrhage, and suspected child abuse with closed head injuries. Dr. Roig testified that she had atypical bruising and distinctive hand marks on her face. Dr. Roig also concluded that her multiple abnormal injuries were inconsistent with Appellant's story that he had fallen on top of her. The child was, "as close to death as you come without dying." (Tr., pp. 166, 172-175.) She was subsequently life flighted to Pittsburgh.
 {¶ 45} Theresa Bunting, the victim's mother, testified that after these injuries, the child was admitted to the Pittsburgh hospital for about two and a half to three months and she underwent several surgeries. At the time of trial, the child could no longer walk, talk, or even crawl. She had little to no vision in her left eye. (Tr., pp. 206-208, 210.)
 {¶ 46} Contrary to Appellant's testimony, Theresa testified that it was very rare for him to check on the toddler during the six-month period that they lived together. (Tr., pp. 205-206) Theresa never saw Appellant physically abuse any of her children. However, in the past she had noticed bruising on her daughter after she had been in Appellant's care. *Page 12 
 {¶ 47} The victim's older brother testified. He was home with his sister and Appellant on the night in question. He was watching television when Appellant and his sister were in the bathroom. He recalled hearing thumping noises and the victim crying for about ten minutes. They then went into the child's room and her brother heard more thumping and more crying. Had Appellant tripped and fallen in the hallway that night, the boy thought he would have seen or heard it based on where he was sitting. However, the boy also testified that Appellant had never hurt him. (Tr., pp. 217-218, 224-225, 233-234.)
 {¶ 48} Jefferson County Sheriff Fred Abdalla testified. He described his interview with Appellant during which Appellant said he fell on top of the girl after tripping over a stroller. (Tr., pp. 100-106.) Appellant admitted to Abdalla that he is unable to control his temper, but that he did not cause all of the girl's bruises, indicating that she falls often. Further, Appellant told Abdalla that the bruises on her diaper area were from him wiping too hard to clean her diarrhea. Appellant also said something to the effect that he did not remember how many times he had slapped the child that night, but he did not slap her hard. Appellant then asked for counseling. (Tr., pp. 106-108.)
 {¶ 49} Appellant wrote out his version of the facts on the evening in question in which he stated that he accidentally fell on top of the child. (Tr., pp. 109-110.)
 {¶ 50} Dr. Rachel Berger from the children's hospital in Pittsburgh, a specialist who studies and researches the affects of inflicted versus non-inflicted brain injuries on children, also testified. She consulted on the victim's case. (Tr., pp. 246-252.) *Page 13 
 {¶ 51} Dr. Berger examined the girl after her first surgery. She was still on a ventilator at the time. Dr. Berger showed the jury the CT scan of a normal child the victim's age and compared it to the victim's, which showed significant brain swelling, noting that her brain had very little oxygen for a prolonged time. Dr. Berger explained that the surgeons had to remove two of the lobes in her brain in order to give it room to swell and prevent her death. Part of her skull was also removed. Dr. Berger concluded in her report that the girl's injuries were "NOT" consistent with Appellant falling on top of her. Dr. Berger concluded that her injuries were a result of physical abuse. (Tr., pp. 255, 259, 265-269, 274, 276.)
 {¶ 52} Appellant takes issue with Dr. Berger's testimony in part. Appellant alleges that Dr. Berger referenced a study entitled the Pounder Case Report in her testimony, yet she did not actually rely on this report in formulating her opinion in this case. (Tr., pp. 295-296.) As such, Appellant claims that the reference and discussion of this report were prejudicial.
 {¶ 53} Per Dr. Berger's testimony, the Pounder Case Report is a record of the physical injuries sustained by Israeli soldiers as a result of shaking as a form of torture. Based on the fact that there are rarely witnesses to this type of abuse and little to no studies documenting the actual affects of shaking, this report was discussed to explain the effects of shaking on humans. (Tr., p. 296.) Thus, although Dr. Berger did not directly state that she relied on this report, that conclusion is evident based on the rest of her testimony. Hence, it is difficult to discern just what prejudice Appellant now claims. In addition, if Dr. Berger's reference to this report *Page 14 
was problematical, Appellant has waived his argument to this effect because Appellant's counsel did not object to this testimony at trial. Additionally, based on the other evidence against him, even if it was error for Dr. Berger to refer to this report, he cannot show that he was prejudiced as a result of this testimony. Thus, any alleged error would be harmless.
 {¶ 54} In his defense, Appellant presented the testimony of his sister-in-law and a good friend. Both women testified that he was good with their respective children and that he was not abusive. (Tr., pp. 397, 402-403.) Neither, however, was present on the night of the victim's injuries.
 {¶ 55} As earlier discussed, on rebuttal Theresa's nephew testified that he had seen Appellant shake the victim when no one else was around. Appellant would yell at the child girl to "stop crying" while he was shaking her. (Tr., pp. 417-420.)
 {¶ 56} Based on the foregoing, Appellant's conviction was not against the manifest weight of the evidence. The evidence established that Appellant was aware that his conduct would probably cause serious physical harm to the child, and serious physical harm did in fact occur. R.C. 2903.11(A)(1). Further, there is nothing showing that the jury clearly lost its way and created a manifest miscarriage of justice in convicting Appellant. The jury evidently did not believe Appellant's self-serving testimony. Thus, this claimed error lacks merit and is overruled.
 {¶ 57} In Appellant's fourth and final assignment of error he alleges:
 {¶ 58} "SENTENCING DEFENDANT-APPELLANT TO THE MAXIMUM ALLOWABLE SENTENCE UNDER THE STATUTE GOES AGAINST THE *Page 15 
CURRENT SENTENCING GUIDELINES TO BE FOLLOWED AS OUTLINED IN THE OHIO REVISED CODE."
 {¶ 59} A trial court has broad discretion in sentencing within the statutory limits, and a reviewing court will not overturn a sentence unless it determines that the trial court abused its discretion.State v. Dultmeyer (1993), 85 Ohio App.3d 81, 83, 619 N.E.2d 91. R.C.2929.12(B) and (C) require the trial court to consider certain criteria before imposing a sentence. However, it has been held that the court does not have to state in the record that it considered the criteria.State v. Koons (1984), 14 Ohio App.3d 289, 470 N.E.2d 922.
 {¶ 60} Appellant argues that the maximum sentence was not warranted in his case upon reviewing the factors set forth in R.C. 2929.12. He claims that the sentencing judge allowed emotion to be his determinative factor based on the tender age of the victim.
 {¶ 61} A review of the sentencing transcript and entry dispels Appellant's argument. The trial court noted in its entry that it considered the purposes and principles in sentencing per R.C. 2929.11 as well as the seriousness and recidivism factors in R.C. 2929.12. These factors were also discussed at the sentencing hearing. (May 24, 2006, Tr., pp. 9, 11, 18; June 15, 2006, Judgment Entry of Sentence.)
 {¶ 62} Thereafter, the trial court judge indicated some of the reasons for the imposition of the maximum sentence, including that Appellant's relationship with the young victim facilitated the offense, that her injuries are disabling and will affect her *Page 16 
and everyone around her for the rest of her life, and that Appellant was still in denial. (Tr., pp. 18-19.)
 {¶ 63} The judge also stressed the tender age of the victim and the fact that she had about 20% of her brain removed, leaving her permanently disabled and blind in one eye as a result of Appellant's actions. The judge also noted that none of the less serious factors apply. (June 15, 2006, Judgment Entry of Sentence.) Thus, the maximum sentence of eight years was warranted.
 {¶ 64} Accordingly, we are unable to find that the trial court abused its discretion in sentencing Appellant to the maximum sentence of eight years. As such, this assignment of error lacks merit and is overruled.
 {¶ 65} In conclusion, Appellant's assignments of error fail and his conviction and sentence are hereby affirmed in full.
 Donofrio, J., concurs. Vukovich, J., concurs. *Page 1